# EXHIBIT D

1  Richard J. Mooney (CA State Bar No. 176486)
   *richard.mooney@rimonlaw.com*
2  RIMON P.C.
   One Embarcadero Center #400
3  San Francisco, CA 94111
   Telephone: (415) 539-0443
4

5  Attorneys for Plaintiffs
   Chris Garville, Commerce Overseas Corp.,
6  Robert Cantu, Petras Air Work Industries, and
   The Robert and Dianne Cantu Family Trust Dated July 9, 2003
7

**FILED**
ALAMEDA COUNTY

APR 14 2016

CLERK OF THE SUPERIOR COURT
By
Deputy

8

9                    CALIFORNIA SUPERIOR COURT

10                   FOR THE COUNTY OF ALAMEDA

11

12

13 | Chris Garville, a citizen and resident of
   | California; Commerce Overseas Corp., a New
14 | York corporation; Robert Cantu, a citizen and
   | resident of California; Petras Air Work
15 | Industries, a California corporation; and The
   | Robert and Dianne Cantu Family Trust Dated
16 | July 9, 2003, a California trust,
17 |                    Plaintiffs,
18 |
   |          v.
19 |
20 | Merex Group Inc., a Delaware corporation;
   | Merex Holding Corp., a Delaware corporation;
21 | Merex Aircraft Company, Inc., a California
   | corporation; Kellstrom Defense Aerospace,
22 | Inc., a Florida corporation; Dubin Clark &
   | Company, Inc., a Delaware corporation; ALCO
23 | Services, Inc., a Delaware corporation; Chris
   | Celtruda, a resident of California; Michael
24 | Hompesch, a resident of Massachusetts;
   | Andrew Williamson, a resident of California;
25 | Ahmad Shams, a resident of California; Nathan
   | Skop, a resident of Florida; Sherrill Speers, a
26 | resident of North Carolina, and Does 1-10,
27 |
28 |                    Defendants.

CASE NO.  **RG16811618**

Complaint for:  Breach of Contract; Breach of
the Covenant of Good Faith and Fair Dealing;
Interference with Prospective Economic
Advantage; Defamation; Fraud; Employment
Retaliation; Declaratory Relief; Breach of
Shareholder Rights; Breach of Fiduciary Duty;
and Unfair Competition

Jury Trial Demanded

---

Complaint; Jury Demand
*Garville et al. v. Merex Holding Corp. et al.* (Case No. _____)

1       Plaintiffs Chris Garville ("Mr. Garville"), Commerce Overseas Corp. ("COC"),

2  Robert Cantu ("Mr. Cantu"), Petras Air Work Industries ("Petras"), and The Robert and Dianne

3  Cantu Family Trust Dated July 9, 2003 (the "Cantu Trust") (collectively, "Plaintiffs") allege for their

4  complaint against Defendants Merex Group Inc. ("Merex Group"), Merex Holding Corp. ("Merex

5  Holding"), Merex Aircraft Company, Inc. ("Merex Aircraft"), Kellstrom Defense Aerospace, Inc.

6  ("Kellstrom"), Dubin Clark & Company, Inc. ("Dubin Clark"), ALCO Services, Inc. ("ALCO

7  Services"), Chris Celtruda ("Mr. Celtruda"), Andrew Williamson ("Mr. Williamson"), Ahmad

8  Shams ("Mr. Shams"), Michael Hompesch ("Mr. Hompesch"), Nathan Skop ("Mr. Skop"), Sherrill

9  Speers ("Mr. Speers"), and Does 1-10 (collectively, "Defendants") as follows:

10                     **The Parties**

11       1.    During the relevant period, Mr. Garville was a citizen and resident of North

12  Carolina and then a citizen and resident of California.  He currently is a citizen and resident of

13  California, domiciled in Ventura County.

14       2.    During the relevant period, COC was a corporation organized and existing

15  under New York law, with its principal place of business in North Carolina.

16       3.    Mr. Cantu is and at all relevant times has been a citizen and resident of

17  California, domiciled in Alameda County.

18       4.    Petras is and at all relevant times has been a corporation organized and

19  existing under California law with its principal place of business in Alameda County, California.

20       5.    The Cantu Trust is and at all relevant times has been a trust organized and

21  existing under California law.

22       6.    Merex Holding is and at all relevant times has been a corporation organized

23  and existing under the laws of Delaware, with its principal place of business in Ventura County,

24  California.  Dubin Clark holds and at all relevant times has owned a majority share of Merex

25  Holding stock.  Merex Holding directly or indirectly owns and controls Merex Aircraft, ALCO

26  Services, and Kellstrom.  Merex Holding and those subsidiaries are sometimes referred to herein

27  collectively as "Merex".  Merex Holding also directly owns and controls non-party AVL

28  International.

1

7. Merex Aircraft is and at all relevant times has been a corporation organized and existing under the laws of California, with its principal place of business in Ventura County, California.

8. Dubin Clark is and at all relevant times has been a corporation organized and existing under the laws of Delaware, with its principal place of business in Boston, Massachusetts.

9. ALCO Services is and at all relevant times has been a corporation organized and existing under the laws of Delaware, with its principal place of business in Livermore, California.

10. Kellstrom is at and all relevant times has been a corporation organized and existing under the laws of Delaware, with its principal place of business in Hollywood, Florida.

11. Mr. Celtruda is and at all relevant times has been a citizen and resident of either California or Arizona. Mr. Celtruda became CEO of Merex Holdings in May 2013 and has remained in that position since that time.

12. Mr. Williamson is and at all relevant times has been a citizen and resident of California. During the period March 2013 through March 2015, Mr. Williamson was the CFO of Merex Holdings.

13. Mr. Shams is and at all relevant times has been a citizen and resident of California. Mr. Shams is and at all relevant times has been the Chairman of the Board of Directors of Merex Holdings.

14. Mr. Hompesch is and at all relevant times has been a citizen and resident of Massachusetts. Mr. Hompesch is and at all relevant times has been a member of the Board of Directors of Merex Holdings, the Secretary of the Board of Directors of Merex Holdings, and a partner in Dubin Clark.

15. Mr. Skop is and all relevant times has been a citizen and resident of Florida. Mr. Skop was during the relevant period the Merex Executive Vice President for Legal, Contracts, and Compliance and the Compliance Officer for contracts and U.S. State Department licenses for exports of Kellstrom and Merex Holdings, responsible for (among other things) ensuring that the

2

Complaint; Jury Demand
*Garville et al. v. Merex Holding Corp. et al.* (Case No. _____)

1  export licenses applied for by Merex fully comply with the export license requirements and

2  regulations of the U.S. State Department.

3         16.    Mr. Speers is and at all relevant times has been a citizen and resident of North

4  Carolina.

5         17.    Plaintiffs are ignorant of the true names of Defendants sued herein as Does 1

6  through 10, and will seasonably amend this complaint if and when he discovers their true names.

7                          **Jurisdiction and Venue**

8         18.    Subject matter jurisdiction is proper in this Court pursuant to Article 6 of the

9  California Constitution.

10         19.    This Court has personal jurisdiction over Defendants, and each of them,

11  because each Defendant has purposefully availed itself or himself of the benefits and protections of

12  this jurisdiction; and because Defendants' improper actions (and failures to act) were directed at and

13  damaged a California resident, all within the meaning of Cal. Civil Code § 410.10.

14         20.    Venue is proper in this Court pursuant to Cal. Code Civ. Pro. § 395.

15                              **Factual Allegations**

16  *Defendants' Counterfeit Parts Scheme*

17         21.    Starting in November 2014, Mr. Garville learned that Merex Holding and its

18  subsidiaries had secretly sold counterfeit military parts to Chile and exported those parts using

19  fraudulent Export Licenses.  On February 17, 2015, he discovered that Merex was planning to make

20  a GE Engine part for a Korean order worth $426,360 and emailed his Division President Mr.

21  Faulkner advising him that Merex should not put GE's part number on those parts.  In May 2015,

22  Mr. Garville learned that Merex was selling counterfeit cockpit longerons (which are "fatigue

23  critical" parts) to Thailand.  Since his wrongful termination, Mr. Garville learned of several other

24  counterfeit parts made and sold by Merex.  (The conduct described in this paragraph and detailed

25  below is collectively referred to as "Defendants' Counterfeit Parts Scheme").

26                                  Chile

27         22.    In early 2014 or late 2013, Chilean Air Force (through Chile's ENAER –

28  *Empresa Nacional de Aeronautica de Chile*, or "National Aeronautical Company of Chile") issued a

1   request for proposal seeking bids on a contract to provide 10 sets of brakes for their F-5 military

2   aircraft. The request for proposal specifically requested part number 5001703, National Stock

3   Number 1630-00-032-6102, brakes manufactured by Meggitt Aircraft Braking Systems ("Meggitt"),

4   which is the sole source of F-5 brakes qualified and approved by the U.S. Government Defense

5   Logistics Agency (DLA) and the U.S. Air Force. Further, the U.S. government states in SOL

6   SPE4AX14R0001 that "[t]he only acceptable manufacturing source for these items is Meggitt

7   Aircraft Braking Systems CAGE 0B9R9 . . .".

8          23.     The National Stock Number assigned by the U.S. Air Force for F-5 brakes

9   manufactured by Meggitt is 1630-00-032-6102 and Meggitt's proprietary part number is 5001703.

10  This particular National Stock Numbers applies only to F-5 brakes manufactured by Meggitt – there

11  are no other qualified manufacturers to manufacture these F-5 brakes.

12         24.     At the time, Meggitt was typically charging about $975 for each set of brakes

13  in quantities of 10 each. Non-Merex respondents to the Chilean Air Force's request for production

14  therefore could be expected to quote slightly more than that for each set of brakes, since they would

15  expect to pay Meggitt around the $975 and add profit margin on top. Merex, however, quoted $945,

16  less than its own cost to purchase genuine brakes.

17         25.     In April 2014, the Chilean Air Force issued purchase order number 10122 for

18  10 sets of F-5 brakes for delivery on June 27, 2014. The purchase order specifically requested parts

19  with National Stock Number 1630-00-032-6102 and Meggitt proprietary part number 5001703.

20         26.     Rather than purchase genuine National Stock Number 1630-00-032-6102 and

21  Meggitt proprietary part number 5001703 to provide to the Chilean Air Force, Merex chose to have

22  the Merex Engineering Division manufacture knockoffs and instructed the engineering division to

23  mark the parts with Meggitt's proprietary part number 5001703 as if they had been made by

24  Meggitt. Merex appears to have created the counterfeit brakes in three basic steps. First, it

25  purchased "As Removed" brake assemblies manufactured by Meggitt from surplus dealer Chrisbarry

26  Aircraft Corporation (Purchase Order P70232) to disassemble and create an engineering drawing

27  from which it manufactured the brakes. Second, Merex apparently supplied a Merex Engineering

28  Drawing Number M2013114 Rev. A and a Purchase Order to GMP Friction Products, an industrial

1   (non-aerospace) manufacturer of brakes and clutches to make the brakes, possibly directing GMP

2   Friction Products to put the Meggitt proprietary part numbers on the brake material.  The Merex

3   Drawing No. M2013114 states in Note 4: "ID Per Location on Print with P/N 9535035 Mfg 7V438

4   Opposition of C'Bore."  P/N 9535035 is a subassembly proprietary part number, proprietary to

5   Meggitt Aircraft Braking Systems.  Mfg 7V438 is Merex's U.S. Department of Defense Supplier ID

6   CAGE Code, falsely and illegally showing Merex as manufacturer of Meggitt's parts.  Merex

7   engineering drawings are managed and supervised by Mr. Steven Melvin, Director of Engineering

8   and Manufacturing.  The GMP Friction Products brake material is much lower cost than Meggitt's

9   costs, since the material does not have to meet (and be tested and certified to meet) the required

10   MIL-W-5013L standard.  Third, Merex apparently used a small third party company to "bond" the

11   brake material to the brake device.

12          27.     In June 2014, Merex shipped five of the ten sets of brakes that it had

13   manufactured and stamped with the Meggitt proprietary part number to the Chilean Air Force,

14   intentionally concealing from Chilean authorities that the brakes were actually counterfeit parts

15   being manufactured by Merex.  Along with that shipment, Merex sent invoice 275938 requesting

16   payment for and specifically referring to the shipped brakes as "Meggitt part number 5001703 Disk,

17   Stationary National Stock Number (NSN) 1650-00-220-3074" parts.

18          28.     To legally export military hardware of this nature, Merex was required to

19   obtain a valid export license from the United States Department of State, on which it was legally

20   required identify and enter the Commodity, the Manufacturer of the Commodity, and the Source of

21   the Commodity.  Mr. Skop was responsible for ensuring the export licenses applied for by Merex

22   fully comply with all export license requirements and regulations of the U.S. State Department.

23          29.     Since the U.S. Customs Service polices exports in part by comparing the

24   Merex commercial invoice with the Merex export license to ensure that the documents match, Merex

25   falsified the export license, representing to the Department of State (just as it had represented to the

26   Chilean Air Force) that the parts were manufactured by Meggitt and qualified for the use of Meggitt

27   proprietary part number 5001703 and National Stock Number 1650-00-220-3074, a serious offence

28   punishable by ITAR 127.2.

30.   Meggitt-manufactured brakes are designed, tested, and developed in accordance with Specification MIL-W-5013L, which covers main and auxiliary wheel and brake assemblies for all types of military aircraft.[1] Because Meggitt-manufactured brakes are made to that exacting Specification and use material that is proprietary and confidential and the only material to have passed the relevant U.S. military testing, it is extremely likely that the counterfeit brakes provide performance that is inferior to the performance of legitimate Meggitt-manufactured brakes. The typical landing speed for the F-5s operated by the Chilean air force is 155 knots or 173 miles per hour, a speed at which the pilot's life would be in serious danger if the brakes fail.

31.   In addition, to violation of U.S. law, the conduct described above is contrary to the commitments made by Merex to obtain certification that it was in compliance with Merex's AS9100 Rev 'C' Quality Management System to which Merex was certified to. AS9100 is a critical aerospace ("AS") certification that is a virtual requirement to be able to market and sell parts for military aircraft. In particular, AS9100 requires strict compliance with multiple standards designed to ensure against the shipment of counterfeit parts. In this instance, Merex failed to meet AS9100 standards (1) when the Quality Manager failed to ensure that the Purchasing Department was buying genuine parts; (2) when the Purchasing Department failed to purchase the item that the customer ordered; and (3) when the Compliance Department failed to ensure that the brakes were genuine and met the export license requirements. Merex then failed again to meet AS9100 standards by failing to report these serious violations to their AS9100 Registrar SAI Global and failing to comply with the AS9100 CAR (Corrective Action Report) process requiring prompt performance of a "Root Cause Analysis" involving all involved Merex employees and resulting in a "Correction Action Process".

---

[1]   MIL-W-5013L incorporates a broad range of Specifications that must be met to comply with the overall MIL-W-5013L Specification, including for example FF-B-1W; QQ-A-596; QQ-A-601; QQ-G-320; QQ-P-416; TT-P-28; MIL-A-21180; MIL-A-22773; MIL-P-23377; MIL-C-25427; MIL-P-25732 MIL-G-8232Z; MIL-L-81958; MIL-P-81958; MIL-P-81985; MIL-G-83016; MIL-F-83142; MIL-C-83286; MIL-P-83461. MIL-W-5013L further incorporates dozens of "Standards" too numerous to list here and multiple "Requirements" including "Brake Construction" section 3.3.8.2; "Brake Design" section 3.3.7; "Brake Fusing Level and Therms Release Torque Tests" section 4.3.2.4; and "Brake Capacity Calculations: Method I, Method II, Approval" section 3.3.7 relating to critical test criteria.

1    32. In November 2014, in response to complaints from the Chilean Air Force that

2 they had received only five of the ten sets that had been promised for delivery in June 2014,

3 Mr. Garville investigated the reason for the delay.  He was informed by Mr. Benny Garcia, the

4 Purchasing Manager of the Merex Engineering Division, that the brakes are not ready because they

5 "are having the pads bonded onto the disks," clearly indicating that the brakes were not being

6 purchased from Meggitt as Merex and Mr. Skop represented to the customer and the State

7 Department.

8    33. Mr. Garville promptly investigated and learned that (1) the Chilean Air Force

9 did not know of or authorize the replacement of genuine Meggitt brakes with Merex-manufactured

10 brakes that were never tested or approved under MIL-W-5013L and by the Air Force, and (2) Merex

11 had applied the Meggitt proprietary part number the National Stock Number, thereby defrauding

12 both the Chilean Air Force and the U.S. State Department.

13    34. Mr. Garville promptly alerted the Chilean Air Force of the counterfeit brakes.

14 In response, the Chilean Air Force was forced to ground the F-5s that had been fitted with the

15 counterfeit brakes.  Mr. Garville then arranged for the return of the counterfeit brakes and arranged

16 for Merex to purchase 10 sets of genuine Meggitt brakes and deliver them to Chile.

17    35. At that time, Defendants assured Mr. Garville that new controls had been

18 imposed to guard against the subsequent manufacture and sale of counterfeit brakes.  These

19 assurances were false.[2]

20           <u>Thailand</u>

21    36. Indeed, contrary to the assurances provided to Mr. Garville, only two months

22 later in January 2015, Merex sold F-5 brakes bearing the Meggitt proprietary part number and

23

---

24   [2] In addition to sale of counterfeit brakes to the Chilean Air Force described above, it
25 appears that Merex also counterfeited other Meggitt brake part numbers (including 5001182,
  5001186, 5001701, 5001703, 5001704, 5001705, and GSY187-68W) in sales made to the Royal
26 Thai Air Force under Merex Sales Orders 1034156 and 1036025, shipped under Merex Invoice
  270903 on or about February 27, 2009 and in sales made to the Brazilian Air Force under Purchase
27 Order 11T003563 on or about September 20, 2011.  The evidence demonstrating whether indeed
  those sales also involved counterfeit parts will be available in discovery, since Aerospace Quality
28 Records and Certificates of Conformance are generally available for 7-10 years.

1   National Stock Number to the Royal Thai Air Force (invoice number 1036025) at a price of only

2   $354 each (quantity of 30), strongly suggesting that they too were counterfeit parts.

3          37.   In addition to selling the Royal Thai Air Force counterfeit brakes (obviously a

4   Critical Safety Item), Merex had previously sold the Royal Thai Air Force counterfeit "Fatigue

5   Critical" F-5 longerons, a safety-of-flight and mission-critical aspect of the aircraft fuselage the

6   failure of which can lead and has led to the destruction of the aircraft and death of the pilot.

7          38.   Mr. Garville learned of the counterfeit longerons in the period of April to May

8   2015, after being contacted by the Swiss Air Force Maintenance Company RUAG, seeking

9   longerons for their F-5 fleet. Mr. Garville approached Jerry Smink at Alcoa about the necessary

10  Step Die extrusions (p/n 2-10347-5 and 2-10347-6 required to make the longerons under

11  Engineering Drawing 14-10304, Longeron, Upper FS 182.92 to 284.00, noting that it should be like

12  the past Merex order since he knew Merex had previously sold F-5 longerons to the Royal Thai Air

13  Force. Mr. Sminik confirmed they had not been contacted regarding the purchase of these Step Die

14  extrusions for this longerons sale, which necessarily meant that the longerons sold were counterfeit.

15  Merex acknowledged the Royal Thai Air Force's purchase order DAE 81 P.S./55 on March 9, 2012

16  under Merex Sales Order 816719.

17         39.   Genuine longerons approved by the U.S. Air Force are manufactured through

18  an exhaustive process of multiple steps governed by numerous technical requirements governing the

19  metal, the extrusion process, the testing process, and the like. Merex did not meet those

20  requirements, even though these parts are Fatigue Critical structural airframe components that secure

21  the fuselage from behind the pilot seat to the final bulkhead of the F-5, to the forward section up to

22  the nose of the aircraft. In addition, Merex sold part numbers 14-10304-9 and 14-10304-10 (which

23  were proprietary to Northrop Grumman), although there was a material change that Northrop

24  Grumman made changing from Aluminum Alloy 7075 T6511 (for -7 and -8 parts) to 7075 T73511

25  (for -9 and -10 parts).

26         40.   Mr. Garville informed his direct supervisor Mr. Faulkner of the counterfeit

27  longerons. Mr. Faulkner stated that he would contact the appropriate Thai officials and that Merex

28  would replace the counterfeit longerons after they were done fulfilling the Swiss order. He then

1    instructed Mr. Garville to "not get out of [his] swim lane" and to take no further action related to

2    Thailand. Mr. Faulkner directed Mr. Garville not to interfere with the Royal Thai Air Force because

3    Mr. Majic Khabazz was in charge of the Royal Thai Air Force. Mr. Khabazz was a part owner of

4    Merex before the Dubin Clark investment, and is one of Merex's long-time executives and close

5    confidant of Merex's reputed founder Mr. Shams. Plaintiffs are unaware whether Merex did indeed

6    inform the Royal Thai Air Force of the counterfeit longerons, notwithstanding the fact that F-5 pilots

7    have been killed due to cockpit longeron failures.

8         41.    The Royal Thai Air Force was unaware that Merex had sold it counterfeit

9    parts that were different from actual parts ordered. Further, as with the F-5 brakes discussed above,

10   Merex and Mr. Skop falsified the required State Department export license to claim that it was

11   selling and exporting legitimate qualified parts. Again they did this by naming Meggitt as the

12   manufacturer of record for the brakes being exported, by using the Meggitt proprietary part number

13   and using the unique National Stock Number for the original Meggitt brake design on the U.S. State

14   Department export license.

15        42.    Merex also violated its AS9100 Quality System by not ensuring that the parts

16   they made were genuine. Merex apparently purchased "hand forgings" and then contracted with a

17   Newbury Park machine shop (Dangar Engineering & Manufacturing; 2326 Teller Road; Newbury

18   Park, CA 91320) to machine the longerons. Merex then part-marked the longerons "14-10304-9"

19   (Left Hand) and "14-10304-10" (Right Hand), with the "-9" and "-10" representing that it had

20   incorporated the material change made by Northrop Grumman (the OEM) from 7075-T611, QQ-A-

21   200/11 to a newer alloy, thereby counterfeiting the Northrop-engineered longeron that must be made

22   from the special step-die extrusion. Merex sold these counterfeit longerons (pursuant to Royal Thai

23   Air Force Purchase Order DAE 81 P.O./55 and Merex Sales Order #816719) for $27,000 each

24   ($54,000 per set, one left and one right).

25                                        Brazil

26        43.    In April or May of 2015, Mr. Garville learned that Merex had also been

27   selling counterfeit F-5 parts to the Brazilian Air Force, in this case arrestor hooks designed to

28   prevent aircraft landing at high speeds from overshooting the runway.

9

44.    In particular, Mr. Garville received a call from Pedro Perez, the U.S. Air Force "country manager" for Brazil, tasked with assisting the Brazilian Air Force with its equipment and maintenance needs for U.S.-designed military aircraft. Mr. Perez informed Mr. Garville of complaints he had received from the Brazilian Air Force that the arrestor hooks did not perform properly. Mr. Perez also asked for Mr. Garville's help in getting two expensive Test Sets (p/n 14-76022-1, purchased for $76,341 each by Brazil on June 14, 2010 under Purchase Order 10T002425). Mr. Perez explained that Brazil had returned these units at least twice for repair, and that they were still not working. Mr. Garville arranged for his in-country Sales Rep to meet with the Brazilian Air Force to arrange immediate return of the test sets.

45.    Arrestor hooks are safety-critical devices that must be manufactured according to complex and exacting specifications to ensure that they can effectively and safely stop a military aircraft traveling at high speed. Among other things, a specific type of steel must be used, particular forging requirements and vacuum pour requirements must be met, and the device must be tested multiple times throughout the manufacturing process, all as set out in Northrop technical requirement NA1-1279. The typical sale price for the F-5 arrestor hook is approximately $42,000-$45,000.

46.    Upon investigation, Mr. Garville learned that Merex had offered to sell the Brazilian Air Force arrestor hooks (pursuant to Brazilian Aeornautical Commission PO 11T006422 and Merex Sales Order #816096) for $38,946 (just below what a competitor could have offered for a genuine part) and that it had created counterfeit arrestor hooks using only $1,500 worth of materials, having them manufactured by a small company (High Tech Engineering) in Camarillo. Merex purchased 300M/4340 length of 63 – ½" from Fry Steel (Purchase Order P77491). The finished Arrestor Hook (Shank, Hook Arresting, Aircraft) is 61.42" long. Merex sold Brazil part number 14-42502-3 that requires a Precision Die Forging made from 280 Maraging Steel made I/A/W NAI-1279, not 300M/4340 plate. Mr. Garville informed his supervisor Mr. Faulkner of the counterfeit parts. Plaintiffs are unaware of the action, if any, Merex took in response to Mr. Garville's discovery.

47.     The Brazilian Air Force was unaware that Merex had sold it counterfeit parts that were different from actual parts ordered.  Further, as with the F-5 brakes discussed above, Merex and Mr. Skop falsified the required State Department export license to claim that it was selling and exporting legitimate qualified parts.  Again they did this by naming Northrop as the manufacturer of record for the arrestor hooks being exported, by using the Northrop arrestor hook proprietary part number and using the unique National Stock Number for the original Northrop arrestor hook design on the U.S. State Department export license.

### Korea

48.     In a February 2015 meeting with senior Merex executives, Mr. Garville learned that Merex was fulfilling Merex Sales Order 816606 for part number 5016M85G01, CAM ASSY; Afterburner – J-79 engine (with a purchase order value of $426,360) from the Korean Air Force for F-4 engine parts that specifically required parts manufactured by General Electric, with the particular General Electric proprietary part number and National Stock Number by manufacturing its own counterfeit substitute part and placing the General Electric part number and National Stock number on the counterfeit part.

49.     The Korean Air Force was unaware that Merex was planning to sell it counterfeit parts that were different from actual parts ordered.  Mr. Garville emailed Mr. Faulkner on February 17, 2015, saying that Merex should not put the GE part number on a part that was not a genuine GM part.  Mr. Garville was terminated before he knew the result of this particular Korean order.

### Taiwan

50.     In 2013-14, Merex sold horizontal stabilizers to the Republic of China Air Force.  The specifications for those parts established by Northrop require special manufacturing processes and further require die forgings on the "horns".  Rather than selling the ROC Air Force parts manufactured to the required specifications incorporated into the contract, Merex machined the parts out of plate metal.  Merex's sale of horizontal stabilizers not manufactured to Northrop Specification can be confirmed by Steven Cooper, a Northrop F-5 Consultant to Merex who had worked at Northrop for 31 years on the F-5 and T-38 production line.

Complaint; Jury Demand
*Garville et al. v. Merex Holding Corp. et al.* (Case No. _____)

51.     Mr. Garville learned of the counterfeit horizontal stabilizers from a Merex source shortly after he was terminated.

52.     The Republic of China Air Force was unaware that Merex had sold it counterfeit parts that were different from actual parts ordered.  Further, as with the F-5 brakes discussed above, Merex and Mr. Skop falsified the required State Department export license to claim that it was selling legitimate qualified parts.

53.     The intent and effect of Defendants' Counterfeit Parts Scheme was to lower Defendants' costs, so that they could lower their bids to potential customers and secure additional business and associated profit.

54.     Defendants' Counterfeit Parts Scheme was first devised and implemented many years ago by Mr. Shams, and was continued by him during the relevant period with the full knowledge and approval of Mr. Speers, Mr. Hompesch, Mr. Celtruda, Mr. Faulkner, Mr. Melvin, and Mr. Williamson.

55.     As described below, Merex Aircraft terminated Mr. Garville's employment shortly after and exclusively because of his discovery of Defendants' Counterfeit Parts Scheme.[3]

56.     Defendants' Counterfeit Parts Scheme violated the federal Arms Export Control Act (the "AECA") (22 U.S.C. § 2278) and the associated federal International Traffic in Amrs Regulations ("ITAR") (22 CFR 120-30.

57.     Defendants' Counterfeit Parts Scheme violated California's prohibition against military sabotage, including in particular California Military & Veterans Code § 1670 (prohibiting any intentional impairment or interference when such impairment or interference may hinder, delay, or interfere with U.S. assistance to another nation in connection with that nation's defense) and California Military & Veterans Code § 1671 (prohibiting malicious failure to note a defect in any item intended to be used as part of U.S. assistance to another nation in connection with that nation's defense).

---

[3]     Notably, this was not a modest scheme, and nor was it limited to airplanes.  As just one example, the scheme apparently included counterfeit MD-500 helicopter parts (most sold to Korea) valued at hundreds of thousands of dollars or millions of dollars.

58.     Throughout the negotiations of the agreements described below, Defendants actively, intentionally, and successfully concealed from Plaintiffs the existence of the Counterfeit Parts Scheme and the significant effect that the False Invoices Scheme had in making Defendants' businesses appear more profitable and more successful they actually were.

*Defendants' False Invoices Scheme*

59.     During a multi-year period through at least 2014, Defendants illegally inflated their revenues and profits by engaging in sham transactions involving false invoices sent to the Argentine Air Force and possibly others (the "False Invoices Scheme"). Mr. Garville learned of this scheme shortly after he was terminated.

60.     In particular, Defendants worked with one or more Argentine procurement specialists associated with the Argentine Air Force to create invoices apparently from the Argentine Air Force requesting parts and repairs from Defendants. The procurement specialist would then certify that the parts or repairs were delivered (even though they were not), at which point the Argentine Air Force (generally using funds supplied by the UN) paid Defendants for the non-existent parts and services based on the false invoices scheme and Defendants paid the procurement specialist a "commission" far in excess of the commissions that would typically be paid in a legitimate transaction.

61.     Defendants' False Invoices Scheme was originally created and implemented by Mr. Shams and subsequently continued with the full knowledge and approval of Mr. Speers, Mr. Celtruda, and Mr. Williamson.

62.     Defendants' False Invoices Scheme violated the Foreign Corrupt Practices Act as the payments made to officials in Argentina as part of the successful effort to be paid for services not performed were payments made to one or more "foreign officials" within the meaning of 15 U.S.C. § 78dd-2 and the payments were made to induce the foreign official or officials to influence one or more acts or decisions of the government of Argentina or an instrumentality thereof, in order to obtain and retain business (in particular, to obtain and retain the business overpayments for unperformed services).

1        63.    Throughout the negotiations of the agreements described below, Defendants

2 actively, intentionally, and successfully concealed from Plaintiffs the existence of the False Invoices

3 Scheme and the significant effect that the False Invoices Scheme had in making Defendants'

4 businesses appear more profitable and more successful they actually were.

5 *The Purchase of COC*

6        64.    Mr. Garville was the founder, owner, and Chief Executive Officer of COC,

7 which was a successful supplier of parts and equipment to military aircraft customers throughout the

8 world.

9        65.    On or about April 10, 2012, Merex Aircraft, COC, and Mr. Garville entered

10 into an Asset Purchase Agreement (the "COC APA"), pursuant to which Merex Aircraft purchased

11 the principal assets and liabilities of COC.  A true and correct copy of the COC APA is attached

12 hereto as Exhibit A.

13        66.    As relevant here, the COC APA provided that COC would transfer its rights to

14 the assets set out in the COC APA to Merex Aircraft, in exchange for (1) Merex Aircraft's

15 assumption of COC's principal liabilities, (2) a payment of $220,000, and (3) "Additional Payments"

16 due upon the sale by Merex Aircraft of some or all of the "Designated Inventory" (set forth in

17 Exhibit A of the COC APA) being transferred under the COC APA from COC to Merex Aircraft, up

18 to a maximum of $600,000 and during a period of 42 months from the effective date of the COC

19 APA.  The payments were required to be made quarterly, in an amount equal to 50% of the net profit

20 made from the sale of Designated Inventory.

21        67.    COC and Mr. Garville performed all of their obligations under the COC APA.

22        68.    During the 42 months from the effective date of the COC APA, Merex

23 Aircraft made it very difficult for Mr. Garville to sell his parts because they knew that after 42

24 months the ownership of the parts would transfer to Merex.  Mr. Shams had a policy that no one

25 other than Mr. Shams could price items Merex would offer to sell.  Mr. Garville was reprimanded

26 for pricing his own inventory, and the Merex staff refused to cooperate with Mr. Garville due to the

27 pricing policy Mr. Shams enforced.  Mr. Garville complained about this to Mr. Majic Khabazz and

28 Mr. Shams, but was ignored.  On March 3, 2013, Mr. Garville wrote to Hompesch regarding the

Complaint; Jury Demand
*Garville et al. v. Merex Holding Corp. et al.* (Case No. _____)

COC inventory and requesting compliance with the APA, including spreadsheets showing that Merex was not pricing COC inventory value at what they were selling it for, thereby cheating Mr. Garville out of the agreed 50% split of invoiced sales prices. On July 11, 2013, Mr. Garville wrote a second letter to Dubin Clark to report that Merex was failing to comply with the COC APA. On July 24, 2013, Mr. Garville received a response to his letter from Mr. Williamson, stating in part that ". . . *Merex has undertaken no obligation to market or sell any items in the Designated Inventory . . . .*" (emphasis added). On January 21, 2013, Mr. Khabazz (EVP and Director of Sales) approved Mr. Garville pricing inventory, but Merex staff remained uncooperative. Mr. Garville and his attorney David Habib (who Mr. Garville was forced to pay because of Defendants' misconduct) met with Mr. Williamson on September 20, 2013 to discuss the inventory and other issues in the July 11 letter. The parties all agreed that it made perfect business sense to aggressively sell the COC inventory, as reflected in Mr. Garville's October 21, 2013 letter to Mr. Williamson summarizing the meeting. (Mr. Williamson acknowledged receipt of the letter on October 26, without disagreeing with any of the substance). Merex further violated the agreement by deducting improperly inflated "costs of sales" before paying the 50% due to Mr. Garville and by refusing to timely provide the required Quarterly Sales Reports. Despite Merex's policy and refusal to comply with its obligations under the COC APA and associated covenant of good faith and fair dealing, Mr. Garville made significant sales of Designated Inventory and generated significant net profit from those sales, reasonably believed to exceed $1.2 million. In approximately October 2014, Merex Aircraft attempted to evade its obligations under the COC APA by surreptitiously transferring away all of the remaining COC inventory.

69.　Despite proper demand therefore, Merex Aircraft has at no time paid COC the required Additional Payments, reasonably believed to equal $600,000, less $148,354.62 that has been paid – notwithstanding Defendants' knowledge that Mr. Garville urgently needed those funds to support his wife's cancer treatments.

70.　COC and Mr. Garville would not have entered the COC APA if Defendants had not fraudulently concealed the Counterfeit Parts Scheme and False Invoices Scheme, as described above.

71.     COC would have made significant additional profits if it had maintained its independence from Defendants.

*The Employment of Mr. Garville*

72.     On or about April 10, 2012, Merex Aircraft and Mr. Garville entered into an Employment Agreement (the "Garville EA"), pursuant to which Merex Aircraft agreed to employ Mr. Garville.  A true and correct copy of the Garville EA is attached hereto as Exhibit B.

73.     As relevant here, the Garville EA provided that Merex Aircraft would employ Mr. Garville as its Vice President of International Programs for a five year term, followed by additional one year terms.  In exchange for Mr. Garville's work as its Vice President of International Programs, Merex Aircraft agreed to provide Mr. Garville (1) a base salary of $150,000 per year, (2) annual management incentive bonuses of up to 100% of the amount of his base salary, (3) health, accident, disability, and life insurance, and (4) vacation and sick leave.

74.     The Garville EA provided that Merex Aircraft could terminate the agreement (a) upon Mr. Garville's death; (b) upon Mr. Garville's disability; (c) for "Cause" as defined in the Garville EA; or (d) without Cause.  Upon any termination without Cause, Merex Aircraft was required to compensate Mr. Garville for any earned but unpaid bonus, any accrued but unused vacation time, and for six months of Base Salary.

75.     Mr. Garville performed all of his obligations under the Garville EA.

76.     On or about June 8, 2015, Merex Aircraft terminated Mr. Garville's employment without cause.

77.     Merex Aircraft and Mr. Skop effected that termination in retaliation for Mr. Garville's discovery of Defendants' "Counterfeit Parts Scheme" as described in more detail below.

78.     Despite demand therefore, Merex Aircraft and Mr. Skop refused to compensate Mr. Garville for any earned but unpaid bonus, any accrued but unused vacation time, and for six months of Base Salary.

79.     Mr. Garville would not have entered the Garville EA if Defendants had not fraudulently concealed the Counterfeit Parts Scheme and False Invoices Scheme, as described above.

16

80. Mr. Garville's earnings would have been substantially higher if he had maintained his independence from Defendants.

*The Garville NCA*

81. On or about April 10, 2012, Merex Aircraft, COC, and Mr. Garville entered into a Non-Competition and Non-Solicitation Agreement (the "Garville NCA"), pursuant to which Merex Aircraft purported to obligate Mr. Garville not to participate in providing customers anywhere in the world with any aerospace parts or components or any maintenance/repair/overhaul services for a period of five years. A true and correct copy of the Garville NCA is attached hereto as Exhibit C.

82. Although the Garville NCA recited that it was entered into as part of the purchase of "goodwill" from COC, that recitation written by counsel for Merex Aircraft was false.

83. Mr. Garville and COC would not have entered the Garville NCA if Defendants had not fraudulently concealed the Counterfeit Parts Scheme and False Invoices Scheme, as described above.

*Conduct After the Employment of Mr. Garville*

84. After Mr. Garville was terminated, Defendants continued their efforts to destroy him financially by interfering with his ability to earn a living. In particular, Defendants have contacted Mr. Garville's colleagues, associates, and industry peers, threatening to file lawsuits against any person or entity who has a business relationship with him. In addition, Defendants have damaged Mr. Garville's name and reputation by repeatedly making intentionally false statements to multiple persons within the industry.

85. As one example, Merex contacted the U.S. Air Force on September 13, 2015 and threatened the Chief of the Proven Aircraft TCG (Mr. Ross Hubbard), along with his staff, with legal action if Mr. Garville was allowed to make a presentation on using advanced technical equipment for aircraft repair, which is not even a field in which Defendants are involved.

86. Defendants' conduct has seriously damaged Mr. Garville's reputation in the industry, and made it impossible for Mr. Garville to provide for his family (including his gravely ill wife, as Defendants know).

87.    In addition, Defendants have repeatedly threatened potential customers of Mr. Garville with litigation based upon the Garville NCA if they do business with Mr. Garville, notwithstanding Defendants' knowledge that the Garville NCA is unenforceable under California law.

*Mr. Garville's Stock Options*

88.    On or about April 10, 2012, in conjunction with the COC APA and Garville EA described above, Merex Holding and Mr. Garville entered into a Stock Option Agreement (the "Garville SOA"), pursuant to which Merex Holding agreed to provide Mr. Garville an option to purchase 3,700 shares of Class B Common Stock of Merex Holding at a price of $6.50 per share. A true and correct copy of the Garville SOA is attached hereto as Exhibit D.

89.    As relevant here, 925 of the share options would vest on April 10, 2014 if Mr. Garville remained employed; 925 of the share options would vest on April 10, 2015 if Mr. Garville remained employed; 925 of the share options would vest on April 10, 2016 if Mr. Garville remained employed; and the final 925 share options would vest on April 10, 2017 if Mr. Garville remained employed. All share options would vest immediately upon the occurrence of a Disposition Event.

90.    Vested share options could be exercised (a) upon a Disposition Event; (b) upon a Termination of Employment for any reason other than Cause; or (c) nine years and 335 days after the effective date of the agreement.

91.    Mr. Garville performed all of his obligations under the Garville SOA.

92.    Merex's illegal termination of the Mr. Garville's employment described above prevented the 3,700 share options from vesting.

93.    With Merex Holdings stock currently valued in excess of $50 per share, the value of the stock options that Mr. Garville would have owned absent Merex's illegal termination of his employment exceeds $150,000.

*Mr. Garville's Personal Property*

94.    After the retaliatory firing of Mr. Garville, Merex Aircraft refused to return to him a broad swath of his personal possessions despite repeated requests.

1         95.    Mr. Garville was forced to enlist the assistance of the Camarillo Police

2 Department, which managed to "persuade" Merex Aircraft to return some of those possessions.

3         96.    Still, however, Merex Aircraft retained possession of Mr. Garville's personal

4 computer and computer server, containing personal files, family photos, letters, friends' addresses,

5 and personal passwords.

6         97.    Through counsel, Mr. Garville made further written requests for the return of

7 those personal possessions on January 25 and March 11, 2016. Merex Aircraft refused even to

8 respond to those requests.

9         98.    As part of an effort to manufacture fake evidence for use in litigation between

10 the parties, Merex Aircraft personnel used Mr. Garville's personal computer to obtain access to his

11 "LinkedIn" account, to which they uploaded a document that they contended (incorrectly) showed a

12 putative violation of the Garville NCA.

13         99.    Merex Aircraft's refusal to return Mr. Garville's personal possessions, and its

14 use of those possessions to access Mr. Garville's account and fabricate evidence, were accompanied

15 by fraud, oppression, and malice.

16 *COC's Tow Targets*

17         100.    The COC APA explicitly excluded certain COC assets from the asset

18 purchase agreement, including in particular "those items subject to dispute under the United Defense

19 litigation," which included two "Tow Targets".

20         101.    During the period he was employed by Merex Aircraft, Mr. Garville located

21 purchasers for those two Two Targets, and sold them for a total price of $264,264. Notwithstanding

22 that under the clear language of the agreement those Tow Targets belonged to COC, Merex Aircraft

23 retained all of the revenue for the Tow Targets and has repeatedly refused to provide it to COC.

24 *The Purchase of Petras Assets*

25         102.    On or about April 16, 2013, ALCO Services, Petras, Mr. Cantu, Mr. Cantu's

26 wife Dianne Cantu, and Merex Holding entered into an Asset Purchase Agreement (the "Petras

27 APA"), pursuant to which ALCO Services purchased certain assets and liabilities of Petras. A true

28 and correct copy of the Petras APA is attached hereto as Exhibit E.

Complaint; Jury Demand
*Garville et al. v. Merex Holding Corp. et al.* (Case No. _____)

103.    As relevant here, the Petras APA provided that Petras would transfer its rights to the assets set out in the Petras APA to ALCO Services, in exchange for (1) ALCO Services' assumption of certain of Petras's liabilities, (2) a payment of $9,500,000, and (3) an "Earn-Out Payment" equal to 2.5 times the amount by which 2013 EBITDA of the Business exceeded $1,900,000, to a maximum Earn-Out Payment of $3,600,000.

104.    The $9,500,000 payment was subject to adjustment up or down in the event the Estimated Closing Net Working Capital was greater than or less than $1,660,000 at the time of the closing of the transaction.

105.    Petras, Mr. Cantu, and Dianne Cantu performed all of their obligations under the Petras APA.

106.    After the Petras APA was signed, ALCO Services falsely claimed the Estimated Closing Net Working Capital at closing was less than $1,660,000, when in fact it was substantially greater than $1,660,000. In response to pressure from Defendants, and in order to make it possible to focus on his job as President of ALCO Services, Mr. Cantu agreed that Petras would accept a reduction in the purchase price of $200,000 and also contribute additional inventory (valued at approximately $858,000). That agreement was unconscionably unfair, and the result of undue influence and unequal bargaining power.

107.    After the end of the year, ALCO Services claimed that 2013 EBITDA was $687,266 on revenue of $7,865,152 (compared to EBITDA of $1,763,799 on revenue of $8,054,833 in 2012, the last year in which Mr. Cantu was in charge), and paid no earnout to Petras.

108.    The actual EBITDA applying proper accounting principles likely was substantially higher, since Defendants appear to have shifted costs properly applied to other Merex subsidiaries to ALCO Services in violation of the Petras APA. In addition, 2013 EBITDA would have been significantly higher if not for (1) Defendants' decision to unilaterally change the value of the inventory in the ALCO Services financials while having been disclosed in the APA that the inventory volume and values were not precise and had errors; Defendants' decision to exclude intercompany sales and others sales from the period prior to the acquisition; (3) Defendants' decision to renege on the promises to purchase AVON and to add business to ALCO Services from their

20

1   other business; (4) Defendants' improper interference with Mr. Cantu's duties as President; and

2   (5) Mr. Celtruda's grossly inappropriate conduct described below.  As such, Petras was entitled to a

3   significant earnout payment that was not made by ALCO Services.

4          109.   Petras, Mr. Cantu, and Mrs. Cantu would not have entered the Petras APA if

5   Defendants had not fraudulently concealed the Counterfeit Parts Scheme and False Invoices Scheme,

6   as described above.

7          110.   Petras would have made significant additional profits if it had maintained its

8   independence from Defendants.

9   *The Employment of Mr. Cantu*

10         111.   On or about April 16, 2013, ALCO Services and Mr. Cantu entered into an

11  Employment Agreement (the "Cantu EA"), pursuant to which ALCO Services agreed to employ Mr.

12  Cantu.  A true and correct copy of the Cantu EA is attached hereto as Exhibit F.

13         112.   As relevant here, the Cantu EA provided that ALCO Services would employ

14  Mr. Cantu as its President for a three year term, followed by additional one year terms.  In exchange

15  for Mr. Cantu's work as its President, ALCO Services agreed to provide Mr. Cantu (1) a base salary

16  of $225000 per year, (2) annual management incentive bonuses of up to 100% of the amount of his

17  base salary, (3) health, accident, disability, and life insurance, and (4) vacation and sick leave.

18         113.   The Cantu EA provided that ALCO Services could terminate the agreement

19  (a) upon Mr. Cantu's death; (b) upon Mr. Cantu's disability; (c) for "Cause" as defined in the Cantu

20  EA; or (d) without Cause.  Upon any termination without Cause, ALCO Services was required to

21  compensate Mr. Cantu for any earned but unpaid bonus, any accrued but unused vacation time, and

22  for three months of base salary and six months of health insurance benefits.

23         114.   Mr. Cantu performed all of his obligations under the Cantu EA.

24         115.   During the course of Mr. Cantu's employment and in particular in late 2013

25  and early 2014, ALCO Services breached the Cantu EA by refusing to permit Mr. Cantu to operate

26  as the President of the company; repeatedly demeaning and belittling Mr. Cantu (for example, by

27  requiring Mr. Cantu to address Mr. Celtruda as "daddy" in response to Mr. Celtruda's bizarre

28  proclivities and consistently using profanity and violence in workplace meetings); refusing to permit

1  Mr. Cantu to exercise authority over hiring, firing, sales, marketing, and other key decisions; and

2  wrongfully withholding commissions earned by personnel bringing sales and business to the

3  company, and constantly directing "F bombs" toward Mr. Cantu both in private and in front of staff.

4  In addition, Mr. Celtruda and Defendants reneged on promises to purchase AVON, a source of

5  inexpensive material that would have significantly improved ALCO Services' performance in 2013

6  and on promises to pay commissions owed to agents.  Mr. Celtruda also repeatedly harassed Mr.

7  Cantu about needing to travel more, notwithstanding Mr. Cantu's explanation that his travel

8  schedule was dictated by his wife's serious illness and the his other work obligations.

9          116.   ALCO Services' outrageous conduct constituted constructive termination and

10  finally forced Mr. Cantu to submit his resignation in April 2014.  The termination was without

11  "cause" as defined in the Cantu EA.

12          117.   Despite demand therefore, ALCO Services refused to compensate Mr. Cantu

13  for any earned bonus or for three months of Base Salary and six months of health insurance,

14  notwithstanding ALCO Services' knowledge that Mr. Cantu's wife was extremely ill and relied upon

15  her husband's health insurance.

16          118.   Mr. Cantu would not have entered the Cantu EA if Defendants had not

17  fraudulently concealed the Counterfeit Parts Scheme and False Invoices Scheme, as described above.

18          119.   Mr. Cantu's earnings would have been substantially higher if he had

19  maintained his independence from Defendants.

20  *The Cantu Family Trust Stock*

21          120.   On or about April 16, 2013, the Cantu Family Trust and Merex Holding

22  entered into a Subscription Agreement (the "SA"), pursuant to which the Cantu Family Trust agreed

23  to purchase 23,704 shares of newly-issued Merex Holding Class A Common Stock for a total cost of

24  $1,582,750 (approximately $66.77 per share).  A true and correct copy of the SA is attached hereto

25  as Exhibit G.

26          121.   The Cantu Family Trust duly paid the amount required and obtained the stock.

27  *The Cantu NCA*

28

Complaint; Jury Demand
*Garville et al. v. Merex Holding Corp. et al.* (Case No. _____)

122. On or about April 16, 2013, ALCO Services, Petras, and Mr. and Mrs. Cantu entered into a Non-Competition Agreement (the "Cantu NCA"), pursuant to which ALCO Services purported to obligate Mr. Cantu not to participate in providing customers anywhere in the world with any maintenance/repair/overhaul services for a period of five years. A true and correct copy of the Cantu NCA is attached hereto as Exhibit H.

123. Although the Cantu NCA recited that it was entered into as part of the purchase of "goodwill" from Petras, that recitation written by counsel for ALCO Services was false.

124. Mr. Cantu, Mrs. Cantu, and Petras would not have entered the Cantu NCA if Defendants had not fraudulently concealed the Counterfeit Parts Scheme and False Invoices Scheme, as described above.

*The Second Employment of Mr. Cantu*

125. Promptly thereafter, Mr. Celtruda on behalf of ALCO Services proposed that Mr. Cantu enter a new contract to work for ALCO Services, continuing as its President for a brief period as Mr. Celtruda selected another President and then transitioning to the role of Director of Business Development. Most importantly, Mr. Celtruda insisted that Mr. Cantu remain employed in order to not disrupt the anticipated acquisition by Merex Holding of Kellstrom Defense for tens of millions of dollars, which was near closing and which Mr. Celtruda feared would be destabilized if Mr. Cantu was no longer with the company. In exchange for this employment, Mr. Celtruda and ALCO Services offered Mr. Cantu (1) a continuation of his salary and benefits as he had received them under the Cantu EA, (2) the ability to work principally from home to assist with his wife's serious illness, (3) a 3% commission on sales to all customers and programs the he was currently working on, (4) severance of three months of salary and six months of health insurance in the event of a termination without cause, and most importantly (5) the repurchase from the Cantu Family Trust of all of the Merex Holding stock that the Cantu Family Trust had previously acquired, at the price at which it had been acquired (all as described in more detail below).

126. Mr. Cantu accepted that offer, thereby creating a binding agreement (the "Second Cantu EA").

127.   The Cantu Family Trust was an intended third party beneficiary of the Second Cantu EA.

128.   As required by the Second Cantu EA, Mr. Cantu continued in his role as President of the company until the acquisition of Kellstrom Defense was completed and a new company President was hired in May 2014.  He then continued working to develop sales and revenue for ALCO Services in his position of Director of Business Development through June 2014.

129.   In the middle of May 2014, Mr. Cantu challenged Mr. Celtruda's decision to refuse to compensate Steve Ness, who had introduced Mr. Cantu while President of ALCO Services to a potential $58 million JT3D engine repair and overhaul opportunity for the company.  Without Mr. Ness's introduction and expertise in engine repairs, ALCO Services would have never known of the opportunity and without Mr. Cantu's experience with MRO and the ALCO Services MRO facility and FAA Repair Station, ALCO Services would not have been qualified to bid on the opportunity.  Mr. Cantu had requested Mr. Celtruda's authorization to pursue the JT3D engine tender on behalf of ALCO Services with Mr. Ness as its agent in November 2013, after a meeting with Mr. Ness.  Mr. Celtruda verbally approved the pursuit and assigned Mr. Cantu as the program leader to pursue the bid with Mr. Ness's assistance as its agent.  In May 2014, Mr. Celtruda was reneging on his word to Mr. Ness, so Mr. Cantu wrote to Mr. Celtruda and the Board of Directors to express his extreme disappointment with the decision – calling it unprofessional, unfair, and likely to lead to the loss of JT3D engine program.  He also expressed his frustration regarding the delays in supplying the stock cash-out and the revised employment contract to reflect his new role.

130.   In late May 2014, Mr. Celtruda and ALCO Services announced that they were refusing to repurchase the stock held by the Cantu Family Trust as agreed, and attempted to pressure Mr. Cantu into accepting a new and different employment agreement providing for a much less favorable stock repurchase and no severance.  Further, Mr. Celtruda and ALCO Services attempted to strong-arm Mr. Cantu into signing a "Separate and Repurchase Agreement" that contained a complete release of Merex and its affiliates.  Mr. Cantu did not succumb to the pressure and continued to perform his responsibilities under the Second Cantu EA.

Complaint; Jury Demand
*Garville et al. v. Merex Holding Corp. et al.* (Case No. _____)
)

131.     In June 2014, Mr. Celtruda and ALCO Services terminated Mr. Cantu's employment by engaging in conduct and communications that made it impossible for Mr. Cantu reasonably to perform the duties of his position, as described above.  Neither Merex nor ALCO Services provided Mr. Cantu with an exit interview or termination letter, lending further support to his conclusion that his termination resulted at least in part from his insistence on holding Mr. Celtruda accountable for Mr. Ness's invalid dismissal, due to Mr. Cantu's voiced opinions about Mr. Celtruda to the Board of Directors about his aggressive and deviant behavior, due to Mr. Celtruda's refusal to expedite the stock repurchase, and due to Mr. Cantu's refusal to sign an employment contract that attempted to entirely rewrite the actual agreement between the parties.

132.     Despite repeated demand therefore, Mr. Celtruda and ALCO Services refused to provide the severance salary and health insurance required, refused to repurchase the Cantu Family Trust stock, and refused to pay Mr. Cantu the commissions earned under the Second Cantu EA.

*Conduct After the Employment of Mr. Cantu*

133.     After Mr. Cantu was terminated, Defendants continued their efforts to destroy him financially by interfering with his ability to earn a living.  In particular, Defendants have contacted Mr. Cantu's colleagues, associates, and industry peers, threatening to file lawsuits against any person or entity who has a business relationship with him.  In addition, Defendants have damaged Mr. Cantu's name and reputation by repeatedly making intentionally false statements to multiple persons within the industry.

134.     Defendants' conduct has seriously damaged Mr. Cantu's reputation in the industry, and made it impossible for Mr. Cantu to provide for his family.

135.     In addition, Defendants have repeatedly threatened potential customers of Mr. Cantu with litigation based upon the Cantu NCA if they do business with Mr. Cantu, notwithstanding Defendants' knowledge that the Cantu NCA is unenforceable under California law.

136.     Merex Holding has also repeatedly intentionally breached its obligations to provide the Cantu Family Trust with financial and other records to which the Cantu Family Trust is entitled pursuant to Delaware Corporations Code section 220.  In particular, in addition to rejecting

1  informal requests for those records, Defendant ignored Plaintiff's March 15, 2016 formal request

2  signed under oath for those records, which triggered an unconditional obligation of Defendant to

3  provide those records.

4  *Defendants' Inappropriate Business Conduct*

5        137.  Also during the period 2013-14, Mr. Celtruda operated Merex Holding (with

6  the acquiescence of Merex Holding's Board of Directors) in an inappropriate and potentially illegal

7  manner designed to maximize his personal pleasure rather than the company's success or the

8  shareholders' best interests (the "Inappropriate Business Conduct").

9        138.  In particular, Mr. Celtruda on more than one occasion used company funds to

10  entertain attractive young women at air shows and industry conferences despite the fact that they had

11  no business purpose for being there.  Although he told actual and potential clients that there was

12  some business purpose for their attendance (claiming one was a representative of the Pentagon), few

13  if any were fooled and Mr. Celtruda's public lewd and drunk behavior with these women negatively

14  impacted the ability to make sales and generate revenue.

15        139.  Mr. Cantu repeatedly brought Mr. Celtruda's business misconduct and the

16  harm that it was doing to the value of Merex Holding to the attention of the Merex Holding Board of

17  Directors.  Despite those repeated warnings to Mr. Hompesch and the Board of Directors, they did

18  nothing to end the practices and repeatedly indicated to Mr. Cantu that it had no intention of reining

19  in the misconduct.

20  *Defendants' Shareholding Misconduct*

21        140.  In July 2015, Mr. Celtruda and Mr. Hompesch acted in favor of Dubin Clark

22  by implementing a scheme to increase their percentage stage in Merex Holding at the expense of

23  other minority shareholders such as the Cantu Family Trust ("Defendants' Shareholding

24  Misconduct").  In particular, although the Cantu Family Trust stock purchase was made at a

25  $66.71/share value in 2013, and although the stock was valued at approximately $55/share in early

26  2015, and although the true value of the stock in Summer 2015 was between $40-50 per share, Mr.

27  Hompesch and Mr. Celtruda engineered a false valuation in July 2015 of $5.41 per share.  They did

28  so in order to dramatically increase the percentage of shares of the company they owned through a

1   small additional investment, equal to approximately 10% of the amount that should have been

2   invested at a proper valuation.  This had the purpose and effect of diluting the Cantu Family Trust's

3   interest in the company, and the value of that interest.

4        141.   Starting in November 2015, Merex Holdings has refused to provide Mr. Cantu

5   with copies of financial reports to which he is entitled as a shareholder.  Recently, they offered to

6   provide those reports, but only if he agreed to be subject to confidentiality and usage obligations that

7   are not imposed on other shareholders and are not authorized by law, violating Mr. Cantu's rights as

8   an investor and targeting Mr. Cantu for bias and unfair treatment.

9        **1st Cause of Action – Fraudulent Inducment (COC/Garville)**

10       142.   Plaintiffs re-allege and incorporate herein all preceding paragraphs.

11       143.   Defendants represented to COC (in the person of Chris Garville) that the

12  performance and profitability Defendants' businesses were truly and accurately represented in the

13  financial statements and other information provided to COC during the course of negotiating the

14  COC APA, the Garville EA, and the other agreements described above.

15       144.   Defendants intended that COC and Mr. Garville rely upon those

16  representations in considering whether or not to enter into the transactions described above.

17       145.   COC and Mr. Garville did in fact rely upon those representations in deciding

18  to enter into the agreements, which they would not have done absent the false statements.

19       146.   That reliance was reasonable, as Plaintiffs had no reason to know or believe

20  that Defendants were engaged in fraudulent and life-threatening conduct involving military aircraft

21  operated by multiple U.S. allies.

22       147.   In reliance on those representations, COC and Mr. Garville entered into the

23  agreements described above.  Because Defendants' businesses were in reality significantly weaker

24  than they appeared given that the illegal conduct was not sustainable over the long run, COC and

25  Mr. Garville would have earned more profit and compensation remaining independent of

26  Defendants, in amounts to be proven at trial.

27

28

Complaint; Jury Demand
*Garville et al. v. Merex Holding Corp. et al.* (Case No. _____)

148. In acting as detailed herein, Defendants were guilty of oppression, fraud, and/or malice, entitling COC and Mr. Garville to exemplary and punitive damages pursuant to Cal. Civ. Code § 3294.

### 2nd Cause of Action – Breach of the Contract (COC APA)

149. Plaintiffs re-allege and incorporate herein all preceding paragraphs.

150. The COC APA is a valid written contract, signed by authorized representatives of the parties to the contract.

151. COC has fulfilled all of its obligations under the COC APA, other than those (if any) it was excused from performing.

152. Merex Aircraft breached the COC APA, as detailed above, by failing to make the payments to COC required by the contract, including without limitation payments for inventory improperly moved to Florida and payments for Mr. Garville's tow targets sold for $265,000 under two sales invoices, one to "Chilean Air Force, Santiago Chile" for $171,264 and the other to "OS2Corp, Dania FL" for $93,500..

153. As a consequence of Merex Aircraft's breach of the contract, COC has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $600,000.

### 3rd Cause of Action – Breach of the Covenant of Good Faith and Fair Dealing (COC APA)

154. Plaintiffs re-allege and incorporate herein all preceding paragraphs.

155. The COC APA is a valid written contract, signed by authorized representatives of the parties to the contract.

156. The covenant of good faith and fair dealing is implied into every contract pursuant to governing law.

157. Merex Aircraft breached the covenant of good faith and fair dealing implied into the COC APA as described above.

158. As a consequence of Merex Aircraft's breach of the covenant of good faith and fair dealing, COC has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $600,000.

### 4th Cause of Action – Breach of Contract (Garville EA)

159.   Plaintiffs re-allege and incorporate herein all preceding paragraphs.

160.   The Garville EA is a valid written contract, signed by authorized representatives of the parties to the contract.

161.   Mr. Garville has fulfilled all of his obligations under the Garville EA, other than those (if any) he was excused from performing.

162.   Merex Aircraft breached the Garville EA, as detailed above, by failing to provide the Severance Payments to Mr. Garville and by illegally terminating his employment in retaliation for his discovery and exposure of Defendants' Counterfeit Parts Scheme.

163.   As a consequence of Merex Aircraft's breach of the contract, Mr. Garville has suffered damages in an amount to be proven at trial, reasonably estimated (based on written representations made by Dubin Clark in advance of the contract) to be between $4.2 million and $6.1 million.

### 5th Cause of Action – Breach of the Covenant of Good Faith and Fair Dealing (Garville EA)

164.   Plaintiffs re-allege and incorporate herein all preceding paragraphs.

165.   The Garville EA is a valid written contract, signed by authorized representatives of the parties to the contract.

166.   The covenant of good faith and fair dealing is implied into every contract pursuant to governing law.

167.   Merex Aircraft breached the covenant of good faith and fair dealing implied into the Garville EA as described above.

168.   As a consequence of Merex Aircraft's breach of the covenant of good faith and fair dealing, Mr. Garville has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $750,000.

### 6th Cause of Action – Breach of the Covenant of Good Faith and Fair Dealing (SOA)

169.   Plaintiffs re-allege and incorporate herein all preceding paragraphs.

170.   The SOA is a valid written contract, signed by authorized representatives of the parties to the contract.

171. The covenant of good faith and fair dealing is implied into every contract pursuant to governing law.

172. Merex Holding breached the covenant of good faith and fair dealing implied into the SOA as described above.

173. As a consequence of Merex Holding's breach of the covenant of good faith and fair dealing, Mr. Garville has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $150,000.

### 7th Cause of Action – Employment Retaliation

174. Plaintiffs re-allege and incorporate herein all preceding paragraphs.

175. As described above, there was an employment relationship between Mr. Garville and Merex Aircraft.

176. As described above, Merex Aircraft terminated Mr. Garville's employment because of his discovery and reporting of dangerous and illegal conduct, in violation of public policy.

177. The termination was the proximate and legal cause of damages to Mr. Garville in an amount to be proven at trial, reasonably estimated to equal or exceed $750,000.

178. In acting as detailed herein, Defendants were guilty of oppression, fraud, and/or malice, entitling Plaintiffs to exemplary and/or punitive damages pursuant to Cal. Civ. Code § 3294.

### 8th Cause of Action – Interference with Prospective Economic Advantage

179. Plaintiffs re-allege and incorporate herein all preceding paragraphs.

180. After his termination by Defendants, Mr. Garville had multiple economic relationships with third parties that contained the probability of a future economic benefit to him.

181. Defendants were aware of those relationships, and intentionally acted to interfere with those relationships by making deliberately false statements to those third parties.

182. Defendants' conduct was successful, in that their efforts to interfere with Mr. Garville's economic relationships with third parties succeeded in disrupting those relationships, making Mr. Garville unable to provide financial support for his family.

Complaint; Jury Demand
*Garville et al. v. Merex Holding Corp. et al.* (Case No. _____)

1    183.    In acting as detailed herein, Defendants were guilty of oppression, fraud,

2    and/or malice, entitling Mr. Garville to exemplary and/or punitive damages pursuant to Cal. Civ.

3    Code § 3294.

### 9th Cause of Action – Defamation

5    184.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

6    185.    Defendants' statements discussed above were false and unprivileged.

7    186.    Defendants' statements had a natural tendency to injure Mr. Garville because

8    they were false statements about his honesty, trustworthiness, and moral character.

9    187.    Defendants' statements in fact did injure Mr. Garville by denying him

10   employment and other commercial opportunities.

11   188.    In acting as detailed herein, Defendants were guilty of oppression, fraud,

12   and/or malice, entitling Mr. Garville to exemplary and/or punitive damages pursuant to Cal. Civ.

13   Code § 3294.

### 10th Cause of Action – Declaratory Relief re Garville NCA

15   189.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

16   190.    A present, actual, and justiciable controversy exists between the parties

17   regarding the Garville NCA.  Defendants have asserted to Mr. Garville and to third parties who were

18   otherwise prepared to do business with Mr. Garville that the Garville NCA is an enforceable

19   agreement preventing Mr. Garville from conducting any aerospace-related business anywhere in the

20   world for five years.

21   191.    In reality, the Garville NCA is not enforceable under California law because

22   (1) it was not entered into as part of a transaction involving the purchase of business goodwill, and

23   (2) it is overbroad with respect to subject matter, territory, and length.

### 11th Cause of Action – Conversion

25   192.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

26   193.    As detailed above, Merex Aircraft wrongfully converted and exercised

27   dominion over Mr. Garville's personal computer and computer server, which it subsequently used in

28   an effort to create evidence of use in the litigation between the parties.

194.    Also as detailed above, Merex Aircraft wrongfully converted and exercised dominion over the specific proceeds from the sale of the two Tow Targets that belonged to COC, in the amount of $264,264.

195.    As a consequence of those acts of conversion, Mr. Garville and COC have been damaged (and Merex Aircraft has been unjustly enriched) in an amount to be proven at trial.

### 12th Cause of Action – Fraudulent Inducement (Petras, Cantu, and Cantu Family Trust)

196.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

197.    Defendants represented to Mr. Cantu and to the Cantu Family Trust and Petras (both in the person of Mr. Cantu) that the performance and profitability of Defendants' businesses were truly and accurately represented in the financial statements and other information provided to Mr. Cantu during the course of negotiating the Petras APA, the Cantu EA, the SA, and the other agreements described above.

198.    Defendants intended that Plaintiffs rely upon those representations in considering whether or not to enter into the transactions described above.

199.    Plaintiffs did in fact rely upon those representations in deciding to enter into the agreements, which they would not have done absent the false statements.

200.    That reliance was reasonable, as Plaintiffs had no reason to know or believe that Defendants were engaged in fraudulent and life-threatening conduct involving military aircraft operated by multiple U.S. allies.

201.    In reliance on those representations, Plaintiffs entered into the agreements described above.  Because Defendants' businesses were in reality significantly weaker than they appeared given that the illegal conduct was not sustainable over the long run, Petras and Mr. Cantu would have earned more profit and compensation remaining independent of Defendants, in amounts to be proven at trial.

202.    Because Defendants' businesses were in reality significantly weaker than they appeared given that the illegal conduct was not sustainable over the long run, the Cantu Family Trust paid significantly more than the actual value of the Merex Holding stock, and thereby suffered damage in amounts to be proven at trial.

203.   In acting as detailed herein, Defendants were guilty of oppression, fraud, and/or malice, entitling COC and Mr. Garville to exemplary and punitive damages pursuant to Cal. Civ. Code § 3294.

### 13th Cause of Action – Breach of Contract (Cantu EA)

204.   Plaintiffs re-allege and incorporate herein all preceding paragraphs.

205.   The Cantu EA is a valid written contract, signed by authorized representatives of the parties to the contract.

206.   Mr. Cantu has fulfilled all of his obligations under the Cantu EA, other than those (if any) he was excused from performing.

207.   ALCO Services breached the Cantu EA, as detailed above, by refusing to allow Mr. Cantu to act as President of the company, by constructively terminating him, and by failing to provide the Cantu Severance Payments.

208.   As a consequence of ALCO Services' breach of the contract, Mr. Cantu has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $1,000,000.

### 14th Cause of Action – Breach of the Covenant of Good Faith and Fair Dealing (Cantu EA)

209.   Plaintiffs re-allege and incorporate herein all preceding paragraphs.

210.   The Cantu EA is a valid written contract, signed by authorized representatives of the parties to the contract.

211.   The covenant of good faith and fair dealing is implied into every contract pursuant to governing law.

212.   ALCO Services breached the covenant of good faith and fair dealing implied into the Cantu EA by refusing to allow Mr. Cantu to act as President of the company, by constructively terminating him, and by failing to provide the Cantu Severance Payments.

213.   As a consequence of ALCO Services' breach of the covenant of good faith and fair dealing, Mr. Cantu has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $1,000,000.

**15th Cause of Action – Breach of Contract (Second Cantu EA)**

214.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

215.    The Second Cantu EA is a valid contract, entered into by authorized representatives of the parties to the contract.

216.    The Cantu Family Trust was and is an intended third party beneficiary of the Second Cantu EA.

217.    Mr. Cantu has fulfilled all of his obligations under the Second Cantu EA, other than those (if any) he was excused from performing.

218.    ALCO Services breached the Second Cantu EA, as detailed above, by failing to pay Mr. Cantu the commissions he earned.

219.    Merex Holding breached the Second Cantu EA, as detailed above, by failing to repurchase (at the agreed upon price) the Merex Holding stock owned by the Cantu Family Trust.

220.    As a consequence of ALCO Services' breach of the contract, Mr. Cantu has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $500,000.

221.    As a consequence of Merex Holding's breach of the contract, the Cantu Family Trust has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $1,500,000.

**16th Cause of Action – Breach of the Covenant of Good Faith and Fair Dealing (Second Cantu EA)**

222.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

223.    The Second Cantu EA is a valid contract, entered into by authorized representatives of the parties to the contract.

224.    The covenant of good faith and fair dealing is implied into every contract pursuant to governing law.

225.    ALCO Services breached the covenant of good faith and fair dealing implied into the Second Cantu EA, as detailed above, by failing to pay Mr. Cantu the commissions he earned.

226.    Merex Holding breached the covenant of good faith and fair dealing implied into the Second Cantu EA, as detailed above, by failing to repurchase (at the agreed upon price) the Merex Holding stock owned by the Cantu Family Trust.

227.    As a consequence of ALCO Services' breach of the covenant of good faith and fair dealing, Mr. Cantu has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $500,000.

228.    As a consequence of Merex Holding's breach of the covenant of good faith and fair dealing, the Cantu Family Trust has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $1,500,000.

### 17th Cause of Action – Fraud (Second Cantu EA)

229.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

230.    As described above, ALCO Services entered into the Second Cantu EA through the instrument of Mr. Celtruda, with Mr. Celtruda representing to Mr. Cantu for himself and on behalf of ALCO Services that he and ALCO Services intended to comply with the contract.

231.    That representation was false when made by Mr. Celtruda and ALCO Services.

232.    Mr. Celtruda and ALCO Services intended that Mr. Cantu rely upon the representation by accepting the contract and continuing working for ALCO Services going forward.

233.    As a considered representation from the CEO, Mr. Cantu reasonably relied upon the representation in continuing to work for ALCO Services going forward rather than obtaining other employment or devoting that time to management of Petras.

234.    Mr. Celtruda and ALCO Services' intentional misrepresentation was a substantial factor in causing – indeed, it was the sole cause of – the injuries suffered by Mr. Cantu described above.

235.    As a consequence of Mr. Celtruda and ALCO Services' intentional misrepresentation, Mr. Cantu has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $1,500,000.

236.   In acting as detailed herein, Defendants were guilty of oppression, fraud, and/or malice, entitling Plaintiffs to exemplary and/or punitive damages pursuant to Cal. Civ. Code § 3294.

### 18th Cause of Action – Interference with Prospective Economic Advantage

237.   Plaintiffs re-allege and incorporate herein all preceding paragraphs.

238.   After his termination by Defendants, Mr. Cantu had multiple economic relationships with third parties that contained the probability of a future economic benefit to him.

239.   Defendants were aware of those relationships, and intentionally acted to interfere with those relationships by making deliberately false statements to those third parties.

240.   Defendants' conduct was successful, in that their efforts to interfere with Mr. Cantu's economic relationships with third parties succeeded in disrupting those relationships, making Mr. Cantu unable to provide financial support for his family.

241.   In acting as detailed herein, Defendants were guilty of oppression, fraud, and/or malice, entitling Mr. Cantu to exemplary and/or punitive damages pursuant to Cal. Civ. Code § 3294.

### 19th Cause of Action – Defamation

242.   Plaintiffs re-allege and incorporate herein all preceding paragraphs.

243.   Defendants' statements discussed above were false and unprivileged.

244.   Defendants' statements had a natural tendency to injure Mr. Cantu because they were false statements about his honesty, trustworthiness, and moral character.

245.   Defendants' statements in fact did injure Mr. Cantu by denying him employment and other commercial opportunities.

246.   In acting as detailed herein, Defendants were guilty of oppression, fraud, and/or malice, entitling Mr. Cantu to exemplary and/or punitive damages pursuant to Cal. Civ. Code § 3294.

### 20th Cause of Action – Declaratory Relief re Cantu NCA

247.   Plaintiffs re-allege and incorporate herein all preceding paragraphs.

36

248.   A present, actual, and justiciable controversy exists between the parties regarding the Cantu NCA.  Defendants have asserted to Mr. Cantu and to third parties who were otherwise prepared to do business with Mr. Cantu that the Cantu NCA is an enforceable agreement preventing Mr. Cantu from conducting any aerospace-related business anywhere in the world for five years.

249.   In reality, the Cantu NCA is not enforceable under California law because (1) it was not entered into as part of a transaction involving the purchase of business goodwill, and (2) it is overbroad with respect to subject matter, territory, and length.

### 21st Cause of Action – Failure To Provide Financials

250.   Plaintiffs re-allege and incorporate herein all preceding paragraphs.

251.   The Cantu Family Trust is a true shareholder of record of Merex Holding, which is incorporated in Delaware.

252.   Merex Holding has repeatedly refused to permit the Cantu Family Trust to inspect Merex Holding's books and records and/or agreed to do so only upon the Cantu Family Trust's agreement to onerous and improper conditions.

253.   On March 15, the Cantu Family Trust made a proper request under Delaware Corporations Code § 220 to inspect the books and records of Merex Holding, which requires Merex Holding to permit such inspection within five days.

254.   Merex Holding refused to permit the mandated inspection.

255.   The Cantu Family trust has been damaged in its ability to assess the value of and potentially liquidate its investment in Merex Holding by this refusal, in an amount to be proven at trial.

### 22nd Cause of Action – Breach of Fiduciary Duty

256.   Plaintiff re-alleges and incorporates herein all preceding paragraphs.

257.   As senior executives and/or Directors of Merex Holding, Mr. Shams, Mr. Celtruda, Mr. Hompesch, and Mr. Williamson owed a fiduciary duty of competence and loyalty to all holders of Merex Holding securities, including the Cantu Family Trust and Mr. Garville.

258.  As the majority and controlling shareholder of Merex Holding, Dubin Clark owed a fiduciary duty of competent and loyalty to all holders of Merex Holding securities, including the Cantu Trust and Mr. Garville.

259.  Mr. Shams's, Mr. Celtruda's, Mr. Williamson's, Mr. Hompesch's, and Dubin Clark's conduct and omissions described above violated their fiduciary duty to all holders of Merex Holding securities, including the Cantu Family Trust and Mr. Garville.

260.  Defendants' violations of their fiduciary duty caused a reduction in the value of the Cantu Family Trust's and Mr. Garville's securities both by reducing the value of the company as a whole and by reducing the plaintiffs' ownership interests relative to insider securities holders.

261.  As a consequence of Defendants' violations of their fiduciary duty, the Cantu Family Trust and Mr. Garville Merex Holding's breach of the covenant of good faith and fair dealing, the Cantu Family Trust has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $1,500,000.

262.  In acting as detailed herein, Defendants were guilty of oppression, fraud, and/or malice, entitling Plaintiffs to exemplary and/or punitive damages pursuant to Cal. Civ. Code § 3294.

### 23rd Cause of Action – Unfair Competition (Cal. Bus. & Prof. Code §§ 17200 et seq.)

263.  Plaintiffs re-allege and incorporate herein all preceding paragraphs.

264.  Defendants' conduct described above violates California's Sabotage Act and constitutes unfair and/or fraudulent business practices within the meaning of Cal. Bus. & Prof. Code §§ 17200 et seq.

265.  As a consequence of Defendants' unlawful, unfair, and/or fraudulent business practices, Plaintiffs are entitled to restitution from Defendants in an amount to be proven at trial.

266.  As a further consequence of Defendants' unlawful, unfair, and/or fraudulent business practices, Plaintiffs are entitled to injunctive relief as provided in Cal. Bus. & Prof. Code §§ 17200 et seq.

### PRAYER

Wherefore, Plaintiffs pray judgment against Defendants as follows:

38

1           1.     for damages (including treble damages and exemplary and punitive damages)

2  in an amount to be determined at trial;

3           2.     for restitution in an amount to be determined at trial;

4           3.     for the recovery of unjust enrichment in an amount to be determined at trial;

5           4.     for declaratory relief eliminating any putative non-compete obligations of

6  Mr. Garville, Mr. Cantu, and any affiliated persons or entities.

7           6.     for costs and reasonable attorneys fees; and

8           7.     for such other relief as the Court may deem proper.

9

10  Dated:  April 14, 2016          Rimon P.C.

11

12                     By: _____

13                     Richard Mooney
Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint; Jury Demand
*Garville et al. v. Merex Holding Corp. et al.* (Case No. _____)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Demand for Jury Trial**

Plaintiffs hereby demand a jury trial for all issues triable to a jury.

Dated:  April 14, 2016                    Rimon P.C.

By: _____
Richard Mooney
Attorneys for Plaintiffs

Complaint; Jury Demand
*Garville et al. v. Merex Holding Corp. et al.* (Case No. _____)