# EXHIBIT E



1    Richard J. Mooney (CA State Bar No. 176486)
     *richard.mooney@rimonlaw.com*
2    RIMON P.C.
     One Embarcadero Center #400
3    San Francisco, CA 94111
     Telephone: (415) 539-0443
4

5    Attorneys for Plaintiffs
     Chris Garville, Commerce Overseas Corp.,
6    Robert Cantu, Petras Air Work Industries, and
     The Robert and Dianne Cantu Family Trust Dated July 9, 2003
7

8

9
                    CALIFORNIA SUPERIOR COURT
10
                   FOR THE COUNTY OF ALAMEDA
11

12

13   Chris Garville, a citizen and resident of        CASE NO. RG 16811618
     California; Robert Cantu, a citizen and resident
14   of California; and The Robert and Dianne         First Amended Complaint for: Fraudulent
     Cantu Family Trust Dated July 9, 2003, a         Inducement; Breach of Contract; Breach of the
15   California trust,                                 Covenant of Good Faith and Fair Dealing;
                                                       Termination in Violation of Public Policy;
16                      Plaintiffs,                    Employment Retaliation; Unpaid Wages;
                                                       Interference with Prospective Economic
17          v.                                         Advantage; Defamation; Conversion; and
                                                       Breach of Contract
18
     Merex Holding Corp., a Delaware corporation;
19   Merex Aircraft Company, Inc., a California        Jury Trial Demanded
     corporation; Kellstrom Defense Aerospace,
20   Inc., a Florida corporation; Dubin Clark &
     Company, Inc., a Delaware corporation; ALCO
21   Services, Inc., a Delaware corporation; Chris
     Celtruda, a resident of California; Michael
22   Hompesch, a resident of Massachusetts;
     Andrew Williamson, a resident of California;
23   Ahmad Shams, a resident of California; Nathan
     Skop, a resident of Florida; Sherrill Speers, a
24   resident of North Carolina, and Does 1-10,
25
                        Defendants.
26

27

28

FILED
ALAMEDA COUNTY

DEC 2 9 2016

CLERK OF THE SUPERIOR COURT
By _____
                    Deputy

FAXED

1         Plaintiffs Chris Garville ("Mr. Garville"), Robert Cantu ("Mr. Cantu"), and The

2 Robert and Dianne Cantu Family Trust Dated July 9, 2003 (the "Cantu Trust") (collectively,

3 "Plaintiffs") allege for their complaint against Defendants Merex Group Inc. ("Merex Group"),

4 Merex Holding Corp. ("Merex Holding"), Merex Aircraft Company, Inc. ("Merex Aircraft"),

5 Kellstrom Defense Aerospace, Inc. ("Kellstrom"), Dubin Clark & Company, Inc. ("Dubin Clark"),

6 ALCO Services, Inc. ("ALCO Services"), Chris Celtruda ("Mr. Celtruda"), Andrew Williamson

7 ("Mr. Williamson"), Ahmad Shams ("Mr. Shams"), Michael Hompesch ("Mr. Hompesch"), Nathan

8 Skop ("Mr. Skop"), Sherrill Speers ("Mr. Speers"), and Does 1-10 (collectively, "Defendants") as

9 follows:

10                         **The Parties**

11         1.      During the relevant period, Mr. Garville was a citizen and resident of North

12 Carolina and then a citizen and resident of California.  He currently is a citizen and resident of

13 California, domiciled in Ventura County.

14         2.      Mr. Cantu is and at all relevant times has been a citizen and resident of

15 California, domiciled in Alameda County.

16         3.      The Cantu Trust is and at all relevant times has been a trust organized and

17 existing under California law.

18         4.      Merex Holding is and at all relevant times has been a corporation organized

19 and existing under the laws of Delaware, with its principal place of business in Ventura County,

20 California.  Dubin Clark owns and at all relevant times has owned a majority and controlling share

21 of Merex Holding stock.  Merex Holding directly or indirectly owns and controls Merex Aircraft,

22 ALCO Services, and Kellstrom (collectively, "Merex").  Merex Holding also directly owns and

23 controls non-party AVL International.

24         5.      Merex Aircraft is and at all relevant times has been a corporation organized

25 and existing under the laws of California, with its principal place of business in Ventura County,

26 California.

27         6.      Dubin Clark is and at all relevant times has been a corporation organized and

28 existing under the laws of Delaware, with its principal place of business in Boston, Massachusetts.

1        7.     ALCO Services is and at all relevant times has been a corporation organized

2 and existing under the laws of Delaware, with its principal place of business in Livermore,

3 California.

4        8.     Kellstrom is at and all relevant times has been a corporation organized and

5 existing under the laws of Delaware, with its principal place of business in Hollywood, Florida.

6        9.     Mr. Celtruda is and at all relevant times has been a citizen and resident of

7 either California or Arizona.  Mr. Celtruda became CEO of Merex Holdings in May 2013 and has

8 remained in that position since that time.

9        10.    Mr. Williamson is and at all relevant times has been a citizen and resident of

10 California.  During the period March 2013 through March 2015, Mr. Williamson was the CFO of

11 Merex Holdings.

12       11.    Mr. Shams is and at all relevant times has been a citizen and resident of

13 California.  Mr. Shams is and at all relevant times has been the Chairman of the Board of Directors

14 of Merex Holdings.

15       12.    Mr. Hompesch is and at all relevant times has been a citizen and resident of

16 Massachusetts.  Mr. Hompesch is and at all relevant times has been a member of the Board of

17 Directors of Merex Holdings, the Secretary of the Board of Directors of Merex Holdings, and a

18 partner in Dubin Clark.

19       13.    Mr. Skop is and all relevant times has been a citizen and resident of Florida.

20 Mr. Skop was during the relevant period the Merex Executive Vice President for Legal, Contracts,

21 and Compliance and the Compliance Officer for contracts and U.S. State Department licenses for

22 exports of Kellstrom and Merex Holdings, responsible for (among other things) ensuring that the

23 export licenses applied for by Merex fully comply with the export license requirements and

24 regulations of the U.S. State Department.

25       14.    Mr. Speers is and at all relevant times has been a citizen and resident of North

26 Carolina.

27       15.    Plaintiffs are ignorant of the true names of Defendants sued herein as Does 1

28 through 10, and will seasonably amend this complaint if and when he discovers their true names.

**Jurisdiction and Venue**

16.     Subject matter jurisdiction is proper in this Court pursuant to Article 6 of the California Constitution.

17.     This Court has personal jurisdiction over Defendants, and each of them, because each Defendant has purposefully availed itself or himself of the benefits and protections of this jurisdiction; and because Defendants' improper actions (and failures to act) were directed at and damaged a California resident, all within the meaning of Cal. Civil Code § 410.10.

18.     Venue is proper in this Court pursuant to Cal. Code Civ. Pro. § 395.

**Factual Allegations**

*Defendants' Counterfeit Parts Scheme*

19.     Starting in November 2014, Mr. Garville learned that Merex Holding and its subsidiaries had secretly sold counterfeit military parts to Chile and exported those parts using fraudulent Export Licenses.  On February 17, 2015, he discovered that Merex was planning to make a GE Engine part for a Korean order worth $426,360 and emailed his Division President Mr. Faulkner advising him that Merex should not put GE's part number on those parts.  In May 2015, Mr. Garville learned that Merex was selling counterfeit cockpit longerons (which are "fatigue critical" parts) to Thailand.  Since his wrongful termination, Mr. Garville learned of several other counterfeit parts made and sold by Merex.  (The conduct described in this paragraph and detailed below is collectively referred to as "Defendants' Counterfeit Parts Scheme").

**Chile**

20.     In early 2014 or late 2013, Chilean Air Force (through Chile's ENAER – *Empresa Nacional de Aeronautica de Chile*, or "National Aeronautical Company of Chile") issued a request for proposal seeking bids on a contract to provide 10 sets of brakes for their F-5 military aircraft.  The request for proposal specifically requested part number 5001703, National Stock Number 1630-00-032-6102, brakes manufactured by Meggitt Aircraft Braking Systems ("Meggitt"), which is the sole source of F-5 brakes qualified and approved by the U.S. Government Defense Logistics Agency (DLA) and the U.S. Air Force.  Further, the U.S. government states in SOL

3

1   SPE4AX14R0001 that "[t]he only acceptable manufacturing source for these items is Meggitt

2   Aircraft Braking Systems CAGE 0B9R9 . . . .".

3         21.   The National Stock Number assigned by the U.S. Air Force for F-5 brakes

4   manufactured by Meggitt is 1630-00-032-6102 and Meggitt's proprietary part number is 5001703.

5   This particular National Stock Numbers applies only to F-5 brakes manufactured by Meggitt – there

6   are no other qualified manufacturers to manufacture these F-5 brakes.

7         22.   At the time, Meggitt was typically charging about $975 for each set of brakes

8   in quantities of 10 each.  Non-Merex respondents to the Chilean Air Force's request for production

9   therefore could be expected to quote slightly more than that for each set of brakes, since they would

10  expect to pay Meggitt around the $975 and add profit margin on top.  Merex, however, quoted $945,

11  less than its own cost to purchase genuine brakes.

12        23.   In April 2014, the Chilean Air Force issued purchase order number 10122 for

13  10 sets of F-5 brakes for delivery on June 27, 2014.  The purchase order specifically requested parts

14  with National Stock Number 1630-00-032-6102 and Meggitt proprietary part number 5001703.

15        24.   Rather than purchase genuine National Stock Number 1630-00-032-6102 and

16  Meggitt proprietary part number 5001703 to provide to the Chilean Air Force, Merex chose to have

17  the Merex Engineering Division manufacture knockoffs and instructed the engineering division to

18  mark the parts with Meggitt's proprietary part number 5001703 as if they had been made by

19  Meggitt.  (Merex Manufacturing Manager Benny Garcia can confirm these allegations.)  Merex

20  appears to have created the counterfeit brakes in three basic steps.  First, it purchased "As Removed"

21  brake assemblies manufactured by Meggitt from surplus dealer Chrisbarry Aircraft Corporation

22  (Purchase Order P70232) to disassemble and create an engineering drawing from which it

23  manufactured the brakes.  Second, Merex apparently supplied a Merex Engineering Drawing

24  Number M2013114 Rev. A and a Purchase Order to GMP Friction Products, an industrial (non-

25  aerospace) manufacturer of brakes and clutches to make the brakes, possibly directing GMP Friction

26  Products to put the Meggitt proprietary part numbers on the brake material.  The Merex Drawing No.

27  M2013114 states in Note 4:  "ID Per Location on Print with P/N 9535035 Mfg 7V438 Opposition of

28  C'Bore."  P/N 9535035 is a subassembly proprietary part number, proprietary to Meggitt Aircraft

1   Braking Systems.  Mfg 7V438 is Merex's U.S. Department of Defense Supplier ID CAGE Code,

2   falsely and illegally showing Merex as manufacturer of Meggitt's parts.  Merex engineering

3   drawings are managed and supervised by Mr. Steven Melvin, Director of Engineering and

4   Manufacturing.  The GMP Friction Products brake material is much lower cost than Meggitt's costs,

5   since the material does not have to meet (and be tested and certified to meet) the required MIL-W-

6   5013L standard.  Third, Merex apparently used a small third party company to "bond" the brake

7   material to the brake device.

8          25.     In June 2014, Merex shipped five of the ten sets of brakes that it had

9   manufactured and stamped with the Meggitt proprietary part number to the Chilean Air Force,

10  intentionally concealing from Chilean authorities that the brakes were actually counterfeit parts

11  being manufactured by Merex.  Along with that shipment, Merex sent invoice 275938 requesting

12  payment for and specifically referring to the shipped brakes as "Meggitt part number 5001703 Disk,

13  Stationary National Stock Number (NSN) 1650-00-220-3074" parts.

14         26.     To legally export military hardware of this nature, Merex was required to

15  obtain a valid export license from the United States Department of State, and/or the US Dept of

16  Commerce after early 2014, when some aircraft parts were reassigned to Dept of Commerce, Export

17  Controls. The requirements and regulations remain the same for compliance to ITAR, EAR, etc. The

18  US Dept of Commerce Industry and Security, Validated Export License # D529717 on Mar 19, 2014

19  that Expires Mar 31 2018 It states  "…THIS LICENSE HAS BEEN GRANTED IN RELIANCE ON

20  THE REPRESENTATIONS MADE BY THE LICENSEE AND OTHERS IN CONNECTION

21  WITH THE APPLICATION FOR EXPORT AND IS EXPRESSLY SUBJECT TO ANY

22  CONDITIONS STATED ON THE LICENSE, AS WELL AS ALL APPLICIBLE EXPORT

23  CONTROL LAWS, REGULATIONS, RULES, AND ORDERS.  THIS LICENSE IS SUBJECT TO

24  REVISION, SUSPENSION, OR REVOCATION WITHOUT PRIOR NOTICE…"  This License

25  was issued to Applicant Number: CHI9905; Merex Aircraft Company Inc for PURCHASER:

26  ENAER EMPRESSA NACIONALDE, SANTIAGO, CHILE.  The ECCN (Export Control

27  Classification Number stated is 9A610 specifically for "…SPARE PARTS FOR THE OVERHAUL,

28  REPAIR AND OR MAINTENANCE OF THE F5 FLEET FOR THE CHILEAN AIR FORCE…"

1    The RIDERS AND CONDITIONs further state in Sect. 3.) "…NO RESALE, TRANSFER, OR

2    REEXPORT OF THE ITEMS IS AUTHORIZED…" And in Sect 4.) FOR EACH SHIPMENT

3    SENT INDER THIS LICENSE, THE EXPORTER MUST RETAIN DOCUMENTATION

4    IDENTIFYING THE SPECIFIC COMMODITY, QUANTITY, VALUE AND PARTY NAMES OF

5    THE ITEMS TO BE EXPORTED.  AS SET FORTH IN PART 762 OF THE EXPORT

6    ADMINISTRATION REGULATIONS*(762 refers to Record Keeping), SUCH

7    DOCUMENTATION SHALL BE RETAINED AND MADE AVAILABLE TO THE U.S.

8    GOVERNMENT FOR PRODUCTION AND INSPECTION UPON REQUEST…" In Sect

9    5.)"…EXPORT OR REEXPORT OF PARTS, COMPONENTS, ACCESSORIES OR

10    ATTACHMENTS THAT IMPROVE OR CHANGE THE BASIC DESIGN CHARACTERISTICS,

11    E.G., AS TO ACCURACY, CAPABILITY, PERFORMANCE OR PRODUCTIVITY OF THE

12    EQUIPMENT OR OTHER END ITEM UPON WHICH THEY ARE INSTALLED, IS NOT

13    AUTHORIZED…" Mr. Skop was responsible for ensuring the export licenses applied for by Merex

14    fully comply with all export license requirements and regulations of the U.S. State Department (for

15    certain parts after 2014, from the Department of Commerce), on which it was legally required

16    identify and enter the Commodity, the Manufacturer of the Commodity, and the Source of the

17    Commodity. Mr. Skop was responsible for ensuring the export licenses applied for by Merex fully

18    comply with all export license requirements and regulations of the U.S. State Department.

19         27.     Since the U.S. Customs Service polices exports in part by comparing the

20    Merex commercial invoice with the Merex export license to ensure that the documents match, Merex

21    falsified the export license, representing to the Department of Commerce (just as it had represented

22    to the Chilean Air Force) that the parts were manufactured by Meggitt and qualified for the use of

23    Meggitt proprietary part number 5001703 and National Stock Number 1650-00-220-3074, a serious

24    offence punishable by ITAR 127.2.  Defendants' conduct was also in violation of the U.S.

25    Department of Commerce Industry and Security Validated Export License #D529717, issued to

26    Merex on March 19, 2014 to authorize the sale of "spare parts for the overhaul repair and or

27    maintenance of the F5 fleet for the Chilean Air Force, as was their failure to maintain records

28    required to be maintained under the license and their falsification of other such records.

28.     Meggitt-manufactured brakes are designed, tested, and developed in accordance with Specification MIL-W-5013L, which covers main and auxiliary wheel and brake assemblies for all types of military aircraft.[1] Because Meggitt-manufactured brakes are made to that exacting Specification and use material that is proprietary and confidential and the only material to have passed the relevant U.S. military testing, it is extremely likely that the counterfeit brakes provide performance that is inferior to the performance of legitimate Meggitt-manufactured brakes. The typical landing speed for the F-5s operated by the Chilean air force is 155 knots or 173 miles per hour, a speed at which the pilot's life would be in serious danger if the brakes fail.

29.     In addition, to violation of U.S. law, the conduct described above is contrary to the commitments made by Merex to obtain certification that it was in compliance with Merex's AS9100 Rev 'C' Quality Management System to which Merex was certified to.  AS9100 is a critical aerospace ("AS") certification that is a virtual requirement to be able to market and sell parts for military aircraft.  In particular, AS9100 requires strict compliance with multiple standards designed to ensure against the shipment of counterfeit parts.  In this instance, Merex failed to meet AS9100 standards (1) when the Quality Manager failed to ensure that the Purchasing Department was buying genuine parts; (2) when the Purchasing Department failed to purchase the item that the customer ordered; and (3) when the Compliance Department failed to ensure that the brakes were genuine and met the export license requirements.  Merex then failed again to meet AS9100 standards by failing to report these serious violations to their AS9100 Registrar SAI Global and failing to comply with the AS9100 CAR (Corrective Action Report) process requiring prompt performance of a "Root Cause Analysis" involving all involved Merex employees and resulting in a "Correction Action Process".

---

[1]     MIL-W-5013L incorporates a broad range of Specifications that must be met to comply with the overall MIL-W-5013L Specification, including for example FF-B-1W; QQ-A-596; QQ-A-601; QQ-G-320; QQ-P-416; TT-P-28; MIL-A-21180; MIL-A-22773; MIL-P-23377; MIL-C-25427; MIL-P-25732 MIL-G-8232Z; MIL-L-81958; MIL-P-81958; MIL-P-81985; MIL-G-83016; MIL-F-83142; MIL-S-83286; MIL-P-83461.  MIL-W-5013L further incorporates dozens of "Standards" too numerous to list here and multiple "Requirements" including "Brake Construction" section 3.3.8.2; "Brake Design" section 3.3.7; "Brake Fusing Level and Therms Release Torque Tests" section 4.3.2.4; and "Brake Capacity Calculations: Method I, Method II, Approval" section 3.3.7 relating to critical test criteria.

7

1         30.     Documents produced by NASCO Aircraft Brake, Inc. ("NASCO"), the

2    wholly-owned subsidiary of Meggit Aircraft Braking Systems ("MABS") that produces the MABS

3    brakes for the F-5 and other aircraft demonstrate that Merex had never purchased these (or other)

4    brakes or brake parts except on one occasion. The only F-5 brakes Merex purchased were for 10

5    each of the replacement brakes (Merex Purchase Order P83420, issued on December 5, 2014, and

6    shipped to Merex under NASCO invoice number 6130002813 dated December 22, 2014, only 17

7    days after NASCO-MABS rush the genuine breaks. It took Merex over 30 days just to send the

8    purchase order to NASCO-MABS. Mr. Garville instructed Merex Purchasing Manager Benny

9    Garcia to buy genuine NASCO-MABS brakes for Chile to replace the counterfeit brakes that Merex

10   originally and illegally sold to Chile. (Ironically, Merex used the same export license number

11   (D529717) to do so, in violation of the Export License Section 3.)

12        31.     In November 2014, in response to complaints from the Chilean Air Force that

13   they had received only five of the ten sets that had been promised for delivery in June 2014,

14   Mr. Garville investigated the reason for the delay. He was informed by Mr. Benny Garcia, the

15   Purchasing Manager of the Merex Engineering Division, that the brakes are not ready because they

16   "are having the pads bonded onto the disks," clearly indicating that the brakes were not being

17   purchased from Meggitt as Merex and Mr. Skop represented to the customer and the State

18   Department.

19        32.     Mr. Garville promptly investigated and learned that (1) the Chilean Air Force

20   did not know of or authorize the replacement of genuine Meggitt brakes with Merex-manufactured

21   brakes that were never tested or approved under MIL-W-5013L and by the Air Force, and (2) Merex

22   had applied the Meggitt proprietary part number the National Stock Number, thereby defrauding

23   both the Chilean Air Force and the U.S. State Department.

24        33.     Mr. Garville promptly alerted the Chilean Air Force of the counterfeit brakes.

25   In response, the Chilean Air Force was forced to ground the F-5s that had been fitted with the

26   counterfeit brakes. Mr. Garville then arranged for the return of the counterfeit brakes and arranged

27   for Merex to purchase 10 sets of genuine Meggitt brakes and deliver them to Chile.

28

34.     At that time, Defendants assured Mr. Garville that new controls had been imposed to guard against the subsequent manufacture and sale of counterfeit brakes.  These assurances were false.[2]

<u>Thailand</u>

35.     Indeed, contrary to the assurances provided to Mr. Garville, only two months later in January 2015, Merex sold F-5 brakes bearing the Meggitt proprietary part number and National Stock Number to the Royal Thai Air Force (invoice number 1036025) at a price of only $354 each (quantity of 30), strongly suggesting that they too were counterfeit parts.  Documents produced in discovery by NASCO-MABS did not contain *any* Merex purchase orders for these parts, further strongly suggesting that these too were counterfeit.

36.     In addition to selling the Royal Thai Air Force counterfeit brakes (obviously a Critical Safety Item), Merex had previously sold the Royal Thai Air Force counterfeit "Fatigue Critical" F-5 longerons, a safety-of-flight and mission-critical aspect of the aircraft fuselage the failure of which can lead and has led to the destruction of the aircraft and death of the pilot.

37.     Mr. Garville learned of the counterfeit longerons in the period of April to May 2015, after being contacted by the Swiss Air Force Maintenance Company RUAG, seeking longerons for their F-5 fleet.  Mr. Garville approached Jerry Smink at Alcoa about the necessary Step Die extrusions (p/n 2-10347-5 and 2-10347-6 required to make the longerons under Engineering Drawing 14-10304, Longeron, Upper FS 182.92 to 284.00, noting that it should be like the past Merex order since he knew Merex had previously sold F-5 longerons to the Royal Thai Air Force.  Mr. Sminik confirmed they had not been contacted regarding the purchase of these Step Die extrusions for this longerons sale, which necessarily meant that the longerons sold were counterfeit.

---

[2]     In addition to sale of counterfeit brakes to the Chilean Air Force described above, it appears that Merex also counterfeited other Meggitt brake part numbers (including 5001182, 5001186, 5001701, 5001703, 5001704, 5001705, and GSY187-68W) in sales made to the Royal Thai Air Force under Merex Sales Orders 1034156 and 1036025, shipped under Merex Invoice 270903 on or about February 27, 2009 and in sales made to the Brazilian Air Force under Purchase Order 11T003563 on or about September 20, 2011.  The evidence demonstrating whether indeed those sales also involved counterfeit parts will be available in discovery, since Aerospace Quality Records and Certificates of Conformance are generally available for 7-10 years.

9

1    Merex acknowledged the Royal Thai Air Force's purchase order DAE 81 P.S./55 on March 9, 2012

2    under Merex Sales Order 816719.

3          38.    Genuine longerons approved by the U.S. Air Force are manufactured through

4    an exhaustive process of multiple steps governed by numerous technical requirements governing the

5    metal, the extrusion process, the testing process, and the like.  Merex did not meet those

6    requirements, even though these parts are Fatigue Critical structural airframe components that secure

7    the fuselage from behind the pilot seat to the final bulkhead of the F-5, to the forward section up to

8    the nose of the aircraft.  In addition, Merex sold part numbers 14-10304-9 and 14-10304-10 (which

9    were proprietary to Northrop Grumman), although there was a material change that Northrop

10   Grumman made changing from Aluminum Alloy 7075 T6511 (for -7 and -8 parts) to 7075 T73511

11   (for -9 and -10 parts).

12         39.    Mr. Garville informed his direct supervisor Mr. Faulkner of the counterfeit

13   longerons.  Mr. Faulkner stated that he would contact the appropriate Thai officials and that Merex

14   would replace the counterfeit longerons after they were done fulfilling the Swiss order.  He then

15   instructed Mr. Garville to "not get out of [his] swim lane" and to take no further action related to

16   Thailand.  Mr. Faulkner directed Mr. Garville not to interfere with the Royal Thai Air Force because

17   Mr. Majic Khabazz was in charge of the Royal Thai Air Force.  Mr. Khabazz was a part owner of

18   Merex before the Dubin Clark investment, and is one of Merex's long-time executives and close

19   confidant of Merex's reputed founder Mr. Shams.  Plaintiffs are unaware whether Merex did indeed

20   inform the Royal Thai Air Force of the counterfeit longerons, notwithstanding the fact that F-5 pilots

21   have been killed due to cockpit longeron failures.

22         40.    The Royal Thai Air Force was unaware that Merex had sold it counterfeit

23   parts that were different from actual parts ordered.  Further, as with the F-5 brakes discussed above,

24   Merex and Mr. Skop falsified the required State Department export license to claim that it was

25   selling and exporting legitimate qualified parts.  Again they did this by naming Meggitt as the

26   manufacturer of record for the brakes being exported, by using the Meggitt proprietary part number

27   and using the unique National Stock Number for the original Meggitt brake design on the U.S. State

28   Department export license.

First Amended Complaint; Jury Demand
*Garville et al. v. Merex Holding Corp. et al.* (Case No. RG 16811618)

41.     Merex also violated its AS9100 Quality System by not ensuring that the parts they made were genuine.  Merex apparently purchased "hand forgings" and then contracted with a Newbury Park machine shop (Dangar Engineering & Manufacturing; 2326 Teller Road; Newbury Park, CA 91320) to machine the longerons.  Merex then part-marked the longerons "14-10304-9" (Left Hand) and "14-10304-10" (Right Hand), with the "-9" and "-10" representing that it had incorporated the material change made by Northrop Grumman (the OEM) from 7075-T611, QQ-A-200/11 to a newer alloy, thereby counterfeiting the Northrop-engineered longeron that must be made from the special step-die extrusion.  Merex sold these counterfeit longerons (pursuant to Royal Thai Air Force Purchase Order DAE 81 P.O./55 and Merex Sales Order #816719) for $27,000 each ($54,000 per set, one left and one right).

Brazil

42.     In April or May of 2015, Mr. Garville learned that Merex had also been selling counterfeit F-5 parts to the Brazilian Air Force, in this case arrestor hooks designed to prevent aircraft landing at high speeds from overshooting the runway.

43.     In particular, Mr. Garville received a call from Pedro Perez, the U.S. Air Force "country manager" for Brazil, tasked with assisting the Brazilian Air Force with its equipment and maintenance needs for U.S.-designed military aircraft.  Mr. Perez informed Mr. Garville of complaints he had received from the Brazilian Air Force that the arrestor hooks did not perform properly.  Mr. Perez also asked for Mr. Garville's help in getting two expensive Test Sets (p/n 14-76022-1, purchased for $76,341 each by Brazil on June 14, 2010 under Purchase Order 10T002425).  Mr. Perez explained that Brazil had returned these units at least twice for repair, and that they were still not working.  Mr. Garville arranged for his in-country Sales Rep to meet with the Brazilian Air Force to arrange immediate return of the test sets.

44.     Arrestor hooks are safety-critical devices that must be manufactured according to complex and exacting specifications to ensure that they can effectively and safely stop a military aircraft traveling at high speed.  Among other things, a specific type of steel must be used, particular forging requirements and vacuum pour requirements must be met, and the device must be tested multiple times throughout the manufacturing process, all as set out in Northrop technical

11

1   requirement NA1-1279. The typical sale price for the F-5 arrestor hook is approximately $42,000-

2   $45,000.

3            45.      Upon investigation, Mr. Garville learned that Merex had offered to sell the

4   Brazilian Air Force arrestor hooks (pursuant to Brazilian Aeronautical Commission PO 11T006422

5   and Merex Sales Order #816096) for $38,946 (just below what a competitor could have offered for a

6   genuine part) and that it had created counterfeit arrestor hooks using only $1,500 worth of materials,

7   having them manufactured by a small company (High Tech Engineering) in Camarillo. Merex

8   purchased 300M/4340 length of 63 – ½" from Fry Steel (Purchase Order P77491). The finished

9   Arrestor Hook (Shank, Hook Arresting, Aircraft) is 61.42" long. Merex sold Brazil part number 14-

10   42502-3 that requires a Precision Die Forging made from 280 Maraging Steel made I/A/W NAI-

11   1279, not 300M/4340 plate. Mr. Garville informed his supervisor Mr. Faulkner of the counterfeit

12   parts. Plaintiffs are unaware of the action, if any, Merex took in response to Mr. Garville's

13   discovery. The Plaintiffs subpoenaed High Tech Engineering who responded on May 17, 2016. The

14   response demonstrated that Merex drawings were whited- out and data was obscured by blank Post

15   It notes. The Northrop drawings that High Tech received from Merex had no manufacturer's name,

16   and no reference to the requirement that these parts must be made from Precision Die Forgings of a

17   special material. Instead, Merex purchased raw steel bar from Fry Steel under Merex PO # P77491

18   on March 21, 2016. Merex had Fry Steel cut this bar steel into 4 ½" round by 63 ½" long parts, the

19   same rough dimensions as the Genuine Northrop Arrestor Hook. They paid $483.00 each for the

20   steel. They sold the finished parts to Brazil for $38,946.00, making a tremendous profit. They

21   delivered it to High Tech to machine, then brought the parts back where they painted them in their

22   shop and marked them with Northrop part numbers. They received the US State Dept. License that

23   they falsified, again violating US regulations.

24            46.      The Brazilian Air Force was unaware that Merex had sold it counterfeit parts

25   that were different from actual parts ordered. Further, as with the F-5 brakes discussed above,

26   Merex and Mr. Skop falsified the required State Department export license to claim that it was

27   selling and exporting legitimate qualified parts. Again they did this by naming Northrop as the

28   manufacturer of record for the arrestor hooks being exported, by using the Northrop arrestor hook

1 | proprietary part number and using the unique National Stock Number for the original Northrop

2 | arrestor hook design on the U.S. State Department export license.

3 |         47.   In addition to these counterfeit parts sold to Brazil, it was discovered that

4 | Merex sold counterfeit Meggitt-MABS-MABS brakes to Brazil as well, most likely on several

5 | occasions to Jordan, Taiwan, Thailand and Tunisia.  The one incident of record was the sale of 300

6 | each of counterfeited Meggitt-MABS-MABS brakes, part number 5001702 for a price of $269.00

7 | each.  Meggitt-MABS-MABS's price for these same brakes in 2011 was $321.57, verified by Govt

8 | Contract # SPM4A710D0173006, dated 9/28/2011, 8 days after Merex received the PO from Brazil

9 | on 9/20/2011, so the Meggit pricing is a valid indicator.  Through Plaintiff's Subpoena, responded to

10 | on May 4, 2016,  there were 116 pages of GMP Friction documents of which there are numerous

11 | Merex engineering drawings, Purchase Orders, Work Orders, emails, and other information that

12 | clearly proves Merex counterfeited the Meggitt-MABS-MABS brakes.  In this one case for Brazil,

13 | there are GMP and Merex documents showing these 300 counterfeit brakes. GMP provided price

14 | and delivery under GMP # 4545R-3, Merex PO # 814474, were shipped to Merex on 3/30/2012.  On

15 | GMP's documents, GMP writes "...MEREX PRINT M2008082...NOT INCLUDING CNC

16 | ETCHING OF P/N..."  This substantiates Merex's illegal practice of making illegal drawings of

17 | proprietary parts of the Genuine manufacturers under a false (Merex) part number, instructing

18 | companies like GMP not to mark Merex's bogus part number on the parts so that Merex can mark

19 | the parts with the Genuine manufacturer's part number in the privacy of their own shop. The GMP

20 | documents further show that these same parts were shipped on other occasions; 10/30/2008 and

21 | again on 12/4/2008 illustrating that Merex has been counterfeiting brakes for several years.

22 | Plaintiffs learned that Merex purchased the 300 counterfeit brakes from GMP under Merex ref #

23 | 8814474 for cost of $131.00 each, sold them to Brazil (Brazil PO # 11T003563) for $269.00 each, or

24 | $80,700.00 for qty of 300, thereby making a profit of $41,106.00 from a cost of $39,594.00; more

25 | **than 50%.**  Merex purchased these 300 counterfeits from GMP on 10/7/2011 under Merex PO #

26 | P76718.  Merex used their own part numbers, thereby defrauding GMP.  On the GMP Friction

27 | Internal Sales Document, #1605M, GMP subpoenaed documents show GMP delivery date of

28 | 3/30/2012 and Merex shipped the counterfeit brakes on 4/20/2012; after Dubin Clark acquired

1   Merex.  **Of special concern is that it that GMP received an RFQ from a Marissa McKinley of**

2   **MAC Aerospace Corporation, 14558 Lee Road, Chantilly VA, 20151 (an aircraft parts broker**

3   **like Merex) on March 11, 2015 requesting a Quote from GMP for 500 pieces of Meggitt-MABS**

4   **part number 5001702. So, the counterfeiting has spread.**  The GMP documents are even more

5   concerning because on 12/2/2013, GMP (GMP ref # 6284) supplied Susan Schwab, Bidding

6   Manager at Merex with pricing for qty 9,600 Friction Pads, Merex part number M2008084 with a

7   Notation "…STEEL CORES SUPPLIED BY CUSTOMER…" meaning Merex was supplying the

8   Steel Cores, the most important part of the brakes.  This illustrates that Merex, to earn even higher

9   profits, was having the Cores made by yet other machine shops.  Later Discovery documents, that

10  the Plaintiffs now have, show Merex was contracting other small shops in Oxnard, Ventura and

11  Camarillo to make the components for the counterfeit Meggitt-MABS brakes.  The GMP documents

12  contain numerous drawings, including M2008084.  **Since this activity was occurring in December**

13  **of 2013, the CEO, Mr. Celtruda, must have been aware of this illegal conduct and was aware**

14  **of the +50% profits Merex was making on counterfeiting Meggitt-MABS brakes.  In fact, it**

15  **may have been Mr. Celtruda that demanded higher margins on Merex sales, thereby driving**

16  **Merex staff to find even cheaper ways to counterfeit their products.**  The 116 pages of evidence

17  from GMP contains hard evidence of counterfeiting. In addition, emails and engineering questions

18  containing very disturbing dialog concerning the engineering conditions and accepted defects in the

19  GMP brakes.  Merex and GMP do not have, nor do they retain, any engineers with experience in

20  Aircraft Brakes, nor are they compliant to MIL-W-5013L.  Yet, they are making engineering

21  decisions about aircraft brakes for F-5 fighter jets that land at 170 MPH.  The new US Dept of

22  Commerce Export Licensing regulations didn't take effect until 2014, so these counterfeit parts were

23  shipped under a US State Dept Export License.  The Merex Empowered Official and Compliance

24  Officer during this period was Sherrill Speers, CFO Merex, who was put in place by Dubin Clark.

25  This fact is documented in US Dept of State Office of Defense Trade Controls, Washington DC.

26  Letter dated April 2, 2012 addressed to Sherrill Speers, CFO at Merex. The latter says, among other

27  regulations, laws and requirements "…AS YOU ARE THE SENIOR OFFICER WHO HAS BEEN

28  EMPOWERED TO SIGN THE REGISTRATION STATEMENT AND TRANSMITTAL

1   LETTERS WE ASK YOU TO CONFIRM WHICH KEY SENIOR OFFICER LISTED ON THE
2   REGISTRATION WILL OVERSEE THE EXPORT COMPLIANCE PROGRAM AND BE
3   RESPONSIBLE FOR DESIGNATING THE FULL-TIME EMPLOYEES WHO WILL SERVE AS
4   'EMPOWERED OFFICIALS' BY NAME, POSITION, BUSINESS UNIT, PHONE AND FAX.
5   Merex was not in compliance.  Exporting counterfeit parts under a US Dept. of State Export License
6   is a serious offence punishable by 7 figure fines and possible criminal charges.  GMP is also in
7   violations of their ITAR compliance as there is no documentation showing ITAR compliance what
8   so ever in the subpoenaed documents the Plaintiffs received.  The counterfeiting spread from GMP
9   to other companies including Wilco Inc. 3502 W Harry, Wichita, KS. Contact there named Clinton
10  Gillette was providing pricing to GMP for material that GMP was using to make Merex parts.

Korea

11
12          48.     In a February 2015 meeting with senior Merex executives, Mr. Garville
13  learned that Merex was fulfilling Merex Sales Order 816606 for part number 5016M85G01, CAM
14  ASSY; Afterburner – J-79 engine (with a purchase order value of $426,360) from the Korean Air
15  Force for F-4 engine parts that specifically required parts manufactured by General Electric, with the
16  particular General Electric proprietary part number and National Stock Number by manufacturing its
17  own counterfeit substitute part and placing the General Electric part number and National Stock
18  number on the counterfeit part.

19          49.     The Korean Air Force was unaware that Merex was planning to sell it
20  counterfeit parts that were different from actual parts ordered.  Mr. Garville emailed Mr. Faulkner on
21  February 17, 2015, saying that Merex should not put the GE part number on a part that was not a
22  genuine GM part.  Mr. Garville was terminated before he knew the result of this particular Korean
23  order.

24          50.     In addition to this, there are 114 Purchase Orders that Merex received from
25  the Korean Air Force.  Over 40 of these are Proprietary MD Helicopter parts. In the Subpoenaed
26  documents of TRUPART Manufacturing, 440 A Dupont Court, Ventura CA 93003 (*646 pages) and
27  of HYPER-TECH, LLC of 300 Bernoulli Circle, Oxnard, CA 93030 (*+500pages) contain
28  numerous instances of MD Helicopter Proprietary parts, too many to list in this complaint.  There are

15

1    copies of MD Helicopter (previously Hughes Helicopter) engineering drawing where Merex has

2    redacted (whited out) the OEM's name, and either left it blank or put their name on it, in the same

3    fashion as they did with Meggitt-MABS drawings sent to GMP, Northrop drawings sent to High

4    Tech Engineering, and others. MD part numbers are on so many of these documents that the list is

5    too long for this complaint. One part sold to Korea was Merex PO P78721 to HYPER-TECH for

6    each MD part number 369A2095-1 HINGE, ACCESS DOOR for Merex cost of $133.00 each.

7    Merex Invoice to Korea is 274588 and Korea's PO KFX-DAPA-21AD08A14. One can imagine

8    Merex's profit margin along with MD Helicopter's lost revenue due to Merex counterfeiting their

9    parts. In addition another complex can costly  one of the MD parts, Link Assy, Main Rotor Hub

10   (Critical Safety Item) part number 369A1230-51 was photographed in Merex's shipping department

11   in a quantity of about 100 parts. On the ID Label is Bar Code, Part Number Desc, Qty Inspection

12   Date and Serial Number, but, no Manufacturer's Identification at all. Not only is this an ITAR, EAR

13   violation, but an AS9100 violation rated as a Major Non-Conformance that, in legally operated

14   companies, would require an immediate Audit and Stop Production Order. Plaintiffs have

15   subpoenaed MD Helicopter for information on the numerous part numbers that Merex illegally

16   produced and sold. Plaintiff's believe that MD's response will be the same as Northrop Grumman,

17   Lockheed, Meggitt-MABS and others – they never produced these parts for Merex. All of the 114

18   Korean Purchase Orders should be thoroughly investigated.

19                                              Taiwan

20            51.     In 2013-14, Merex sold horizontal stabilizers to the Republic of China Air

21   Force. The specifications for those parts established by Northrop require special manufacturing

22   processes and further require die forgings on the "horns". Rather than selling the ROC Air Force

23   parts manufactured to the required specifications incorporated into the contract, Merex machined the

24   parts out of plate metal. Merex's sale of horizontal stabilizers not manufactured to Northrop

25   Specification can be confirmed by Steven Cooper, a Northrop F-5 Consultant to Merex who had

26   worked at Northrop for 31 years on the F-5 and T-38 production line. In response to subpoena,

27   Northrop Grumman has confirmed that Northrop has no documents relating to any sale of these parts

28   to Merex. Plaintiffs subpoenaed Northrop Grumman and received a letter dated July 15, 2016 and

1 │ signed by their General Council that stated that Northrop does not have any document showing that

2 │ Northrop sold any parts, including these. Plaintiffs also subpoenaed Valley Precision, the company

3 │ that manufactured the horizontal stabilizers and the horns around June 2016. Valley has not

4 │ complied, even after several efforts to do so. Plaintiffs are now waiting for the court order from the

5 │ judge in this case that will be forthcoming shortly. The fact that Valley has not complied is evidence

6 │ of wrongdoing.

7 │         52.     Mr. Garville learned of the counterfeit horizontal stabilizers from a Merex

8 │ source shortly after he was terminated.

9 │         53.     The Republic of China Air Force was unaware that Merex had sold it

10 │ counterfeit parts that were different from actual parts ordered. Further, as with the F-5 brakes

11 │ discussed above, Merex and Mr. Skop falsified the required State Department export license to claim

12 │ that it was selling legitimate qualified parts.[3]

13 │         54.     The intent and effect of Defendants' Counterfeit Parts Scheme was to lower

14 │ Defendants' costs by manufacturing substandard aircraft parts not meeting OEM design standards,

15 │ so that they could lower their bids to potential customers and secure additional business and grossly

16 │ inflated associated profits. Defendants took advantage of foreign governments that do not have an

17 │ Inspection Infrastructure like the US Govt. has. These countries rely on the US Govt. Export

18 │ License that they believe is proof the parts they are buying have been inspected by the US Govt. and

19 │ are Genuine. There are numerous other counterfeit parts including Lockheed F-16 parts where

20 │ Merex would let the customer believe they were buying a Genuine Lockheed part. The Plaintiffs

21 │ subpoenaed Lockheed who reported on 7/18/2016 that they did not have any POs or materials for the

22 │ F-16 Ventral Fin that Merex manufactured and sold to the Royal Jordanian Air Force. Documents

23 │ received from TRUPART's documents show that TRUPART made skins, piece parts and tooling for

24 │ the F-16 from POs and engineering data received from Merex.

25 │

26 │ ──────────────

27 │        [3]     The recent responses to subpoenas served on Lockheed and Trupart strongly suggest that
     │ Merex has expanded its illegal counterfeiting scheme to include parts of the more modern and

28 │ sophisticated F-16 fighter as well, including in particular F-16s use by the Royal Jordanian Air
     │ Force.

55.     Defendants' Counterfeit Parts Scheme was first devised and implemented many years ago by Merex founder Mr. Shams, and was continued by him during the relevant period with the full knowledge and approval of Mr. Speers, Mr. Hompesch, Mr. Celtruda, Mr. Faulkner, Mr. Melvin, Mr. Williamson, and Mr. Hompesch.

56.     As described below, Merex Aircraft terminated Mr. Garville's employment shortly after and exclusively because of his discovery of Defendants' Counterfeit Parts Scheme.[4]

57.     Defendants' Counterfeit Parts Scheme violated the federal Arms Export Control Act (the "AECA") (22 U.S.C. § 2278) and the associated federal International Traffic in Arms Regulations ("ITAR") (22 CFR 120-30).

58.     Defendants' Counterfeit Parts Scheme violated California's prohibition against military sabotage, including in particular California Military & Veterans Code § 1670 (prohibiting any intentional impairment or interference when such impairment or interference may hinder, delay, or interfere with U.S. assistance to another nation in connection with that nation's defense) and California Military & Veterans Code § 1671 (prohibiting malicious failure to note a defect in any item intended to be used as part of U.S. assistance to another nation in connection with that nation's defense).

59.     Throughout the negotiations of the agreements described below, Defendants actively, intentionally, and successfully concealed from Plaintiffs the existence of the Counterfeit Parts Scheme and the significant effect that the False Invoices Scheme had in making Defendants' businesses appear more profitable and more successful they actually were.

*Defendants' False Invoices Scheme*

60.     During a multi-year period through at least 2014, Defendants illegally inflated their revenues and profits by engaging in sham transactions involving false invoices sent to the Argentine Air Force and possibly others (the "False Invoices Scheme"). Mr. Garville learned of this scheme shortly after he was terminated.

---

[4]     Notably, this was not a modest scheme, and nor was it limited to airplanes. As just one example, the scheme apparently included counterfeit MD-500 helicopter parts (most sold to Korea) valued at hundreds of thousands of dollars or millions of dollars.

18

61.    In particular, Defendants worked with one or more Argentine procurement specialists associated with the Argentine Air Force to create invoices apparently from the Argentine Air Force requesting parts and repairs from Defendants.  The procurement specialist would then certify that the parts or repairs were delivered (even though they were not), at which point the Argentine Air Force (generally using funds supplied by the UN) paid Defendants for the non-existent parts and services based on the false invoices scheme and Defendants paid the procurement specialist a "commission" far in excess of the commissions that would typically be paid in a legitimate transaction.  This information has been confirmed during the discovery process.  In addition, Kimberly Smith voluntarily emailed Mr. Garville a list in August of 2015, then an updated the list in February 2016 to add more information and phone numbers with addresses of the people she listed.  Rob Lee of Rotortech Services in West Palm Beach is on the list and knows about the helicopters. Joe Large, FAA Inspector was unwittingly deceived by Merex when he came to inspect. Eden Palmero, Accounting Bookkeeper knows about the phony invoices as do Mr. Celtruda, and the other executives named in this lawsuit.

62.    Defendants' False Invoices Scheme was originally created and implemented by Merex found Mr. Shams and subsequently continued with the full knowledge and approval of Mr. Speers, Mr. Celtruda, Mr. Williamson, and Mr. Hompesch.

63.    Defendants' False Invoices Scheme violated the Foreign Corrupt Practices Act as the payments made to officials in Argentina as part of the successful effort to be paid for services not performed were payments made to one or more "foreign officials" within the meaning of 15 U.S.C. § 78dd-2 and the payments were made to induce the foreign official or officials to influence one or more acts or decisions of the government of Argentina or an instrumentality thereof, in order to obtain and retain business (in particular, to obtain and retain the business overpayments for unperformed services).

64.    Throughout the negotiations of the agreements described below, Defendants actively, intentionally, and successfully concealed from Plaintiffs the existence of the False Invoices Scheme and the significant effect that the False Invoices Scheme had in making Defendants' businesses appear more profitable and more successful they actually were.

19

*The Employment of Mr. Garville*

65.     On or about April 10, 2012, Merex Aircraft and Mr. Garville entered into an Employment Agreement (the "Garville EA"), pursuant to which Merex Aircraft agreed to employ Mr. Garville.

66.     As relevant here, the Garville EA provided that Merex Aircraft would employ Mr. Garville as its Vice President of International Programs for a five year term, followed by additional one year terms.  In exchange for Mr. Garville's work as its Vice President of International Programs, Merex Aircraft agreed to provide Mr. Garville (1) a base salary of $150,000 per year, (2) annual management incentive bonuses of up to 100% of the amount of his base salary, (3) health, accident, disability, and life insurance, and (4) vacation and sick leave.

67.     The Garville EA provided that Merex Aircraft could terminate the agreement (a) upon Mr. Garville's death; (b) upon Mr. Garville's disability; (c) for "Cause" as defined in the Garville EA; or (d) without Cause.  Upon any termination without Cause, Merex Aircraft was required to compensate Mr. Garville for any earned but unpaid bonus, any accrued but unused vacation time, and for six months of Base Salary.

68.     Mr. Garville performed all of his obligations under the Garville EA.

69.     On or about June 8, 2015, Merex Aircraft terminated Mr. Garville's employment without cause.

70.     Merex Aircraft and Mr. Skop effected that termination in response to Mr. Garville's refusal to countenance or participate in Defendants' "Counterfeit Parts Scheme" described above, in violation of *Tameny v. Atlantic Richfield*, 27 Cal.3d 167 (1980), and its progeny.

71.     Merex Aircraft and Mr. Skop also acted in retaliation for Mr. Garville's discovery and reporting to his superiors of Defendants' "Counterfeit Parts Scheme" described above, in violation of California Labor Code Section 11.02.5.

72.     After Merex Aircraft and Mr. Skop terminated Mr. Garville's employment, they refused to pay Mr. Garville for his earned but unpaid salary, his earned but unpaid bonus, and his accrued but unused vacation time, as required by the Garville EA and California law.

73.     In addition, Merex Aircraft and Mr. Skop refused to pay Mr. Garville the severance of six months of base salary, as required by the Garville EA.

*Other Conduct Directed at Mr. Garville*

74.     Defendants have made repeated efforts to destroy him financially by interfering with his ability to earn a living.  In particular, Defendants have contacted Mr. Garville's colleagues, associates, and industry peers, threatening to file lawsuits against any person or entity who has a business relationship with him.  In addition, Defendants have damaged Mr. Garville's name and reputation by repeatedly making intentionally false statements to multiple persons within the industry.

75.     As one example, Merex contacted the U.S. Air Force on September 13, 2015 and threatened the Chief of the Proven Aircraft TCG (Mr. Ross Hubbard), along with his staff, with legal action if Mr. Garville was allowed to make a presentation on using advanced technical equipment for aircraft repair, which is not even a field in which Defendants are involved.  Because of Merex's threats, Mr. Garville lost the ability to make this presentation at a major industry event, impacting his ability to obtain customers and make sales.

76.     Defendant Nathan Skop falsely stated to executives and others at Merex that Mr. Garville had violated export compliance regulations (which of course is what Defendants had done for years).  To the contrary, Mr. Garville's company has been licensed for decades and has never had any export compliance issues.

77.     After Mr. Garville was terminated for learning of and reporting Defendants' illegal conduct, David Faulkner falsely told several major actual and potential clients that Mr. Garville had violated company confidentiality and had been fired for that reason (both of which statements were false and known by Mr. Faulkner to be false). Mr. Faulkner made those statement to (among others) Empresa Nacional de Aeronautica of Chile (including its CEO General Cleveland, its General Manager of Marketing Jorge Flores, its Vice President of Klaus Hartmann, its Director of Aeronautical Manufacturing Carlos Torealba, and several others including Eduardo Munoz). Because of Mr. Faulkner's false statements, ENAER now refuses to do business with COC, despite a 25-year history of doing business prior to Mr. Faulkner's false statements.

21

1    78.    Mr. Faulkner also made similar false statements to General Porras, Colonel

2   Mondacca, and Major Castillo of the Chilean Air Force, which has similarly stopped doing business

3   with COC because of the false statements.

4    79.    Similarly, Ahmad Shams made false statements to several officers of the

5   Brazilian Air Force regarding his abilities and conduct, leading to what so far has been a permanent

6   break in the relationship between Mr. Garville and COC and the Brazilian Air Force.

7    80.    In short, Defendants' conduct has seriously damaged Mr. Garville's reputation

8   in the industry, and made it impossible for Mr. Garville to provide for his family (including his

9   gravely ill wife, as Defendants know).

10   *Mr. Garville's Personal Property*

11    81.    After the retaliatory firing of Mr. Garville, Merex Aircraft refused to return to

12   him a broad swath of his personal possessions despite repeated requests.

13    82.    Mr. Garville was forced to enlist the assistance of the Camarillo Police

14   Department, which managed to "persuade" Merex Aircraft to return some of those possessions.

15    83.    Still, however, Merex Aircraft retained possession of Mr. Garville's personal

16   computer and computer server, containing personal files, family photos, letters, friends' addresses,

17   and personal passwords.

18    84.    Through counsel, Mr. Garville made further written requests for the return of

19   those personal possessions on January 25 and March 11, 2016. Merex Aircraft still refused to return

20   those personal possessions.

21    85.    As part of an effort to manufacture fake evidence for use in litigation between

22   the parties, Merex Aircraft personnel used Mr. Garville's personal computer to obtain access to his

23   "LinkedIn" account, to which they uploaded a document that they contended (incorrectly) showed a

24   putative violation of the Garville NCA.

25    86.    Defendants plainly intended to convert his personal possessions by exercising

26   permanent dominion over them and not returning them to their rightful owner. This intent is

27   confirmed by, among other things, (1) the fact that they were obviously Mr. Garville's property

28   (family photos, friends' addresses, individual passwords, a computer not issued by Merex); (2) the

1   fact that even a police presence was sufficient only to persuade Defendants into a partial return; (3)

2   Defendants' refusal to comply with written requests from counsel; and (4) Defendants' use of the

3   converted property in an effort to obtain a litigation advantage.

4          87.    Merex Aircraft's refusal to return Mr. Garville's personal possessions, and its

5   use of those possessions to access Mr. Garville's account and fabricate evidence, were accompanied

6   by fraud, oppression, and malice.

7   *The Employment of Mr. Cantu*

8          88.    On or about April 16, 2013, ALCO Services and Mr. Cantu entered into an

9   Employment Agreement (the "Cantu EA"), pursuant to which ALCO Services agreed to employ Mr.

10  Cantu.

11         89.    As relevant here, the Cantu EA provided that ALCO Services would employ

12  Mr. Cantu as its President for a three year term, followed by additional one year terms.  In exchange

13  for Mr. Cantu's work as its President, ALCO Services agreed to provide Mr. Cantu (1) a base salary

14  of $225000 per year, (2) annual management incentive bonuses of up to 100% of the amount of his

15  base salary, (3) health, accident, disability, and life insurance, and (4) vacation and sick leave.

16         90.    The Cantu EA provided that ALCO Services could terminate the agreement

17  (a) upon Mr. Cantu's death; (b) upon Mr. Cantu's disability; (c) for "Cause" as defined in the Cantu

18  EA; or (d) without Cause.  Upon any termination without Cause, ALCO Services was required to

19  compensate Mr. Cantu for any earned but unpaid bonus, any accrued but unused vacation time, and

20  for three months of base salary and six months of health insurance benefits.

21         91.    Mr. Cantu performed all of his obligations under the Cantu EA.

22         92.    During the course of Mr. Cantu's employment and in particular in late 2013

23  and early 2014, ALCO Services breached the Cantu EA by refusing to permit Mr. Cantu to operate

24  as the President of the company; repeatedly demeaning and belittling Mr. Cantu (for example, by

25  requiring Mr. Cantu to address Mr. Celtruda as "daddy" in response to Mr. Celtruda's bizarre

26  proclivities and consistently using profanity and violence in workplace meetings); refusing to permit

27  Mr. Cantu to exercise authority over hiring, firing, sales, marketing, and other key decisions; and

28  wrongfully withholding commissions earned by personnel bringing sales and business to the

1    company, and constantly directing "F bombs" toward Mr. Cantu both in private and in front of staff.

2    In addition, Mr. Celtruda and Defendants reneged on promises to purchase AVON, a source of

3    inexpensive material that would have significantly improved ALCO Services' performance in 2013

4    and on promises to pay commissions owed to agents.  Mr. Celtruda also repeatedly harassed Mr.

5    Cantu about needing to travel more, notwithstanding Mr. Cantu's explanation that his travel

6    schedule was dictated by his wife's serious illness and the his other work obligations.

7            93.     ALCO Services' outrageous conduct constituted constructive termination and

8    finally forced Mr. Cantu to submit his resignation in April 2014.  The termination was without

9    "cause" as defined in the Cantu EA.

10   *The Cantu Family Trust Stock*

11           94.     On or about April 16, 2013, the Cantu Family Trust and Merex Holding

12   entered into a Subscription Agreement (the "SA"), pursuant to which the Cantu Family Trust agreed

13   to purchase 23,704 shares of newly-issued Merex Holding Class A Common Stock for a total cost of

14   $1,582,750 (approximately $66.77 per share).

15           95.     The Cantu Family Trust duly paid the amount required and obtained the stock.

16   *The Second Employment of Mr. Cantu*

17           96.     Promptly thereafter, Mr. Celtruda on behalf of ALCO Services proposed that

18   Mr. Cantu enter a new contract to work for ALCO Services, continuing as its President for a brief

19   period as Mr. Celtruda selected another President and then transitioning to the role of Director of

20   Business Development.  Most importantly, Mr. Celtruda insisted that Mr. Cantu remain employed in

21   order to not disrupt the anticipated acquisition by Merex Holding of Kellstrom Defense for tens of

22   millions of dollars, which was near closing and which Mr. Celtruda feared would be destabilized if

23   Mr. Cantu was no longer with the company.  In exchange for this employment, Mr. Celtruda and

24   ALCO Services offered Mr. Cantu (1) a continuation of his salary and benefits as he had received

25   them under the Cantu EA, (2) the ability to work principally from home to assist with his wife's

26   serious illness, (3) a 3% commission on sales to all customers and programs the he was currently

27   working on, (4) severance of three months of salary and six months of health insurance in the event

28   of a termination without cause, and most importantly (5) the repurchase from the Cantu Family Trust

1   of all of the Merex Holding stock that the Cantu Family Trust had previously acquired, at the price at

2   which it had been acquired.

3           97.    Mr. Cantu accepted that offer, thereby creating a binding agreement (the

4   "Second Cantu EA").

5           98.    The Cantu Family Trust was an intended third party beneficiary of the Second

6   Cantu EA.

7           99.    As required by the Second Cantu EA, Mr. Cantu continued in his role as

8   President of the company until the acquisition of Kellstrom Defense was completed and a new

9   company President was hired in May 2014. He then continued working to develop sales and

10  revenue for ALCO Services in his position of Director of Business Development through June 2014.

11          100.   In the middle of May 2014, Mr. Cantu challenged Mr. Celtruda's decision to

12  refuse to compensate Steve Ness, who had introduced Mr. Cantu while President of ALCO Services

13  to a potential $58 million JT3D engine repair and overhaul opportunity for the company. Without

14  Mr. Ness's introduction and expertise in engine repairs, ALCO Services would have never known of

15  the opportunity and without Mr. Cantu's experience with MRO and the ALCO Services MRO

16  facility and FAA Repair Station, ALCO Services would not have been qualified to bid on the

17  opportunity. Mr. Cantu had requested Mr. Celtruda's authorization to pursue the JT3D engine

18  tender on behalf of ALCO Services with Mr. Ness as its agent in November 2013, after a meeting

19  with Mr. Ness. Mr. Celtruda verbally approved the pursuit and assigned Mr. Cantu as the program

20  leader to pursue the bid with Mr. Ness's assistance as its agent. In May 2014, Mr. Celtruda was

21  reneging on his word to Mr. Ness, so Mr. Cantu wrote to Mr. Celtruda and the Board of Directors to

22  express his extreme disappointment with the decision – calling it unprofessional, unfair, and likely to

23  lead to the loss of JT3D engine program. He also expressed his frustration regarding the delays in

24  supplying the stock cash-out and the revised employment contract to reflect his new role.

25          101.   In late May 2014, Mr. Celtruda and ALCO Services announced that they were

26  refusing to repurchase the stock held by the Cantu Family Trust as agreed, and attempted to pressure

27  Mr. Cantu into accepting a new and different employment agreement providing for a much less

28  favorable stock repurchase and no severance. Further, Mr. Celtruda and ALCO Services attempted

1   to strong-arm Mr. Cantu into signing a "Separate and Repurchase Agreement" that contained a

2   complete release of Merex and its affiliates.  Mr. Cantu did not succumb to the pressure and

3   continued to perform his responsibilities under the Second Cantu EA.

4          102.   Throughout April 2014 to June 2014, Mr. Celtruda and Merex made it

5   impossible for Mr. Cantu reasonably to perform the duties of his position as described above, by

6   engaging in conduct and communications including by threatening other ALCO Services employees

7   with retaliation if they did not agree to purposefully keep Mr. Cantu "out of the loop" by not

8   including him on relevant emails or in relevant meetings or phone calls, and by excluding Mr. Cantu

9   from the premises.  Neither Merex nor ALCO Services provided Mr. Cantu with an exit interview or

10   termination letter, lending further support to his conclusion that his termination resulted at least in

11   part from his insistence on holding Mr. Celtruda accountable for Mr. Ness's invalid dismissal, due to

12   Mr. Cantu's voiced opinions about Mr. Celtruda to the Board of Directors about his aggressive and

13   deviant behavior, due to Mr. Celtruda's refusal to expedite the stock repurchase, and due to Mr.

14   Cantu's refusal to sign an employment contract that attempted to entirely rewrite the actual

15   agreement between the parties.

16          103.   Despite repeated demand therefore, Mr. Celtruda and ALCO Services refused

17   to provide the severance salary and health insurance required, refused to repurchase the Cantu

18   Family Trust stock, and refused to pay Mr. Cantu the commissions earned under the Second Cantu

19   EA.

20   *Conduct After the Employment of Mr. Cantu*

21          104.   After Mr. Cantu was terminated, Defendants continued their efforts to destroy

22   him and his remaining company (Reliant Air Power) financially by interfering with his ability to

23   earn a living, black-balling Reliant Air Power from fair competition and paying more to other

24   companies for work previously sent to Reliant Air Power.  In particular, Defendants have contacted

25   Mr. Cantu's and Reliant Air Power's customers, colleagues, associates, and industry peers,

26   spreading untrue statements that Reliant Air Power and Mr. Cantu could not perform business

27   activities that were specifically permitted by the APA (Schedule 4.16 and Schedule 1.2(d), sending

28   Mr. Cantu and Reliant Air Power a demand letter from their in-house counsel (Mr. Skop) ordering

them to halt their operations and threatening potential customers to file lawsuits against any person or entity who has a business relationship with him or Reliant Air Power.  In addition, Defendants have damaged Mr. Cantu's name and reputation by repeatedly making intentionally false statements to multiple persons within the industry blaming him for ALCO Services' poor performance.

105.    In addition, Defendants have intentionally interfered with Mr. Cantu's efforts to sell Reliant and/or partner with certain customers by falsely asserting that Mr. Cantu and Reliant are prevented from entering into such transactions by a noncompete agreement that not only is patently invalid but that specifically permits Mr. Cantu to "continue to conduct the operations of [Petras'] Reliant Air Power Division in materially the same manner that said operations have been conducted prior to the Closing," costing him over $1.7 million in the sale of Reliant Air Power.

106.    Defendants' conduct has seriously damaged Mr. Cantu's reputation in the industry, and made it impossible for Mr. Cantu to provide for his family.

107.    In addition, Defendants have retaliated against and intentionally damaged Mr. Cantu and Reliant Air Power by converting and retaining Reliant's ITAR files that he requires for ITAR compliance to be retained for five years, thus denying Reliant the ability to export material, to its great financial detriment.

108.    Further, for about eight months during the period Mr. Cantu was working for Defendants, Defendants chose to take custody of credentials assigned to Petras by the Federal Government in order to comply with Department of Homeland Security export requirements implemented through the Automated Export System (now updated and called the ACE Portal) (collectively, "ACE") and to deny Mr. Cantu access to these credentials along with his historical files that he had originally demanded be returned to him by Dan Godin (President of ALCO Services) and Bill Ivie (CFO of ALCO Services).  Participation in ACE requires completion of extensive background checks and is mandatory for companies exporting military aircraft hardware. After Defendant's wrongful termination of Mr. Cantu, Defendant's chief compliance employee (Jack Phongpool, who was responsible for all ACE-related activity) stated that he would be returning Petras's ACE credentials to Mr. Cantu.  Defendant's Chief Operating Officer Bill Ivie instructed Mr. Phongpool not to do so, and took the credentials (and required historical records) from Mr.

27

1   Phongpool.  Although Mr. Ivie told Mr. Phongpool that Defendants would return the credentials,

2   Defendants never did so.  Plaintiffs discovered that Defendants had illicitly retained the credentials

3   in late September when Mr. Cantu contacted Mr. Phongpool to retrieve them as part of Petras's

4   efforts to re-start its export business.  Absent those credentials, Petras cannot import or export, and

5   replacing them is a lengthy and time-consuming process and cannot maintain his regulatory

6   compliance.  Multiple requests for the return of the credentials and historic information have been

7   met with silent refusals, without any explanation.

8           109.    Examples of Defendants' defamation and interference with Mr. Cantu and

9   Petras include:

10          *    **Segers Aerospace.**  In early 2016, Mr. Cantu and Petras was poised to

11               enter a deal with Segers Aerospace ("Segers"), pursuant to which

12               Segers would purchase 60% of Petras (then owned 100% by Mr.

13               Cantu) for $1.5 million and would employ Mr. Cantu in a senior

14               leadership position for three years at a salary of $225,000 per year plus

15               commissions and bonuses.  After more than six weeks of negotiation

16               between Mr. Cantu and Segers's CEO Christo Kok, Mr. Kok

17               announced on March 11 via email that:  "Your trade restraint is a

18               major issue as we do not wish to be embroiled in anyway with a

19               dispute between yourself and the purchasers of your business.

20               Absolute clarity has to be established in this matter."  Mr. Cantu tried

21               to assuage Mr. Kok's concerns, but was unable to do so and Mr. Kok

22               terminated the anticipated deal.

23          *    **Greenwich Aero Group.**  In December 2005, Mr. Cantu discussed

24               with Aero Precision (a subsidiary of Greenwich Aero Group) a

25               proposal to sell Petras to Aero Precision and for Mr. Cantu to join

26               Aero Precision as a senior executive.  The executive with whom Mr.

27               Cantu was discussing the possibility raised it to the CEO level, and

28               then reported that "His [the CEO's] 1st reaction was about the non-

28

1    compete and if you are free and clear?".  The potential deal never

2    recovered.[5]

3    ### 1st Cause of Action – Breach of Contract (Garville EA)

4    110.   Plaintiffs re-allege and incorporate herein all preceding paragraphs.

5    111.   The Garville EA is a valid written contract, signed by authorized

6    representatives of the parties to the contract.

7    112.   Mr. Garville has fulfilled all of his obligations under the Garville EA, other

8    than those (if any) he was excused from performing.

9    113.   Merex Aircraft breached the Garville EA, as detailed above, by failing to

10   provide the Severance Payments to Mr. Garville and by illegally terminating his employment in

11   retaliation for his discovery and exposure of Defendants' Counterfeit Parts Scheme.

12   114.   As a consequence of Merex Aircraft's breach of the contract, Mr. Garville has

13   suffered damages in an amount to be proven at trial, reasonably estimated (based on written

14   representations made by Dubin Clark in advance of the contract) to be between $4.2 million and $6.1

15   million.

16   ### 2nd Cause of Action – Breach of the Covenant of Good Faith and Fair Dealing (Garville EA)

17   115.   Plaintiffs re-allege and incorporate herein all preceding paragraphs.

18   116.   The Garville EA is a valid written contract, signed by authorized

19   representatives of the parties to the contract.

20   117.   Mr. Garville has fulfilled all of his obligations under the Garville EA, other

21   than those (if any) he was excused from performing.

22

23

24

25

26

27

28

---

[5]   In addition, in November 2014 Defendants threatened Mr. Cantu directly with the Agreement, even though they did not directly contact third parties.  Specifically, Mr. Skop wrote to Mr. Cantu insisting that he and Petras cease efforts to obtain business *for ALCO Services* from Aero Precision.  The letter was of course complete nonsense, as Mr. Cantu's efforts were to provide a benefit to ALCO Services in the form of work that otherwise would have gone to a competitor.  Nonetheless, the letter had the desired effect of forcing Mr. Cantu to hire and pay a lawyer to write a detailed response.  Mr. Skop refused the answer the response, despite Mr. Cantu's request, thus simply confirming Defendants' bad faith

118.    The covenant of good faith and fair dealing is implied into every contract pursuant to governing law.

119.    Merex Aircraft breached the covenant of good faith and fair dealing implied into the Garville EA as described above.

120.    As a consequence of Merex Aircraft's breach of the covenant of good faith and fair dealing, Mr. Garville has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $750,000.

### 3rd Cause of Action – Termination in Violation of Public Policy

121.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

122.    The Garville EA is a valid written contract, signed by authorized representatives of the parties to the contract.

123.    Mr. Garville has fulfilled all of his obligations under the Garville EA, other than those (if any) he was excused from performing.

124.    Defendants wrongfully terminated Mr. Garville's employment in violation of public policy because of his refusal to countenance and participate in Defendants' illegal conduct as described above.

125.    As a consequence of Defendants' wrongful termination, Mr. Garville has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $750,000.

126.    In acting as detailed herein, Defendants were guilty of oppression, fraud, and/or malice, entitling COC and Mr. Garville to exemplary and punitive damages pursuant to Cal. Civ. Code § 3294.

### 4th Cause of Action – Employment Retaliation

127.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

128.    As described above, there was an employment relationship between Mr. Garville and Merex Aircraft.

30

140.    Defendants were aware of those relationships, and intentionally acted to interfere with those relationships by making deliberately false statements to those third parties.

141.    Defendants' conduct was successful, in that their efforts to interfere with Mr. Garville's economic relationships with third parties succeeded in disrupting those relationships, making Mr. Garville unable to provide financial support for his family.

142.    In acting as detailed herein, Defendants were guilty of oppression, fraud, and/or malice, entitling Mr. Garville to exemplary and/or punitive damages pursuant to California Civil Code § 3294.

### 7th Cause of Action -- Defamation

143.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

144.    Defendants' statements discussed above were false and unprivileged.

145.    Defendants' statements had a natural tendency to injure Mr. Garville because they were false statements about his honesty, trustworthiness, and moral character.

146.    Defendants' statements in fact did injure Mr. Garville by denying him employment and other commercial opportunities.

147.    In acting as detailed herein, Defendants were guilty of oppression, fraud, and/or malice, entitling Mr. Garville to exemplary and/or punitive damages pursuant to California Civil Code § 3294.

### 8th Cause of Action – Conversion

148.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

149.    As detailed above, Merex Aircraft intentionally and wrongfully converted and exercised dominion over Mr. Garville's personal computer and computer server, which it subsequently used in an effort to create evidence of use in the litigation between the parties.

150.    As a consequence of those acts of conversion, Mr. Garville has been damaged (and Merex Aircraft has been unjustly enriched) in an amount to be proven at trial.

151.    In acting as detailed herein, Defendants were guilty of oppression, fraud, and/or malice, entitling Mr. Cantu to exemplary and/or punitive damages pursuant to Cal. Civ. Code § 3294.

1

### 9th Cause of Action – Breach of Contract (Second Cantu EA)

2       152.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

3       153.    The Second Cantu EA is a valid contract, entered into by authorized

4 representatives of the parties to the contract.

5       154.    The Cantu Family Trust was and is an intended third party beneficiary of the

6 Second Cantu EA.

7       155.    Mr. Cantu has fulfilled all of his obligations under the Second Cantu EA,

8 other than those (if any) he was excused from performing.

9       156.    ALCO Services breached the Second Cantu EA, as detailed above, by failing

10 to pay Mr. Cantu the commissions he earned.

11       157.    Merex Holding breached the Second Cantu EA, as detailed above, by failing

12 to repurchase (at the agreed upon price) the Merex Holding stock owned by the Cantu Family Trust.

13       158.    As a consequence of ALCO Services' breach of the contract, Mr. Cantu has

14 suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed

15 $500,000.

16       159.    As a consequence of Merex Holding's breach of the contract, the Cantu

17 Family Trust has suffered damages in an amount to be proven at trial, reasonably estimated to equal

18 or exceed $1,500,000.

19

### 10th Cause of Action – Breach of the Covenant of Good Faith and Fair Dealing (Second Cantu

20 ### EA)

21       160.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

22       161.    The Second Cantu EA is a valid contract, entered into by authorized

23 representatives of the parties to the contract.

24       162.    The covenant of good faith and fair dealing is implied into every contract

25 pursuant to governing law.

26       163.    ALCO Services breached the covenant of good faith and fair dealing implied

27 into the Second Cantu EA, as detailed above, by failing to pay Mr. Cantu the commissions he

28 earned.

33

164. Merex Holding breached the covenant of good faith and fair dealing implied into the Second Cantu EA, as detailed above, by failing to repurchase (at the agreed upon price) the Merex Holding stock owned by the Cantu Family Trust.

165. As a consequence of ALCO Services' breach of the covenant of good faith and fair dealing, Mr. Cantu has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $500,000.

166. As a consequence of Merex Holding's breach of the covenant of good faith and fair dealing, the Cantu Family Trust has suffered damages in an amount to be proven at trial, reasonably estimated to equal or exceed $1,500,000.

## 11th Cause of Action – Interference with Prospective Economic Advantage

167. Plaintiffs re-allege and incorporate herein all preceding paragraphs.

168. After his termination by Defendants, Mr. Cantu had multiple economic relationships with third parties that contained the probability of a future economic benefit to him.

169. Defendants were aware of those relationships, and intentionally acted to interfere with those relationships by making deliberately false statements to those third parties.

170. Defendants' conduct was successful, in that their efforts to interfere with Mr. Cantu's economic relationships with third parties succeeded in disrupting those relationships, making Mr. Cantu unable to provide financial support for his family.

171. In acting as detailed herein, Defendants were guilty of oppression, fraud, and/or malice, entitling Mr. Cantu to exemplary and/or punitive damages pursuant to Cal. Civ. Code § 3294.

## 12th Cause of Action – Defamation

172. Plaintiffs re-allege and incorporate herein all preceding paragraphs.

173. Defendants' statements discussed above were false and unprivileged.

174. Defendants' statements had a natural tendency to injure Mr. Cantu because they were false statements about his honesty, trustworthiness, and moral character.

175. Defendants' statements in fact did injure Mr. Cantu by denying him employment and other commercial opportunities.

34

176.    In acting as detailed herein, Defendants were guilty of oppression, fraud, and/or malice, entitling Mr. Cantu to exemplary and/or punitive damages pursuant to Cal. Civ. Code § 3294.

<h3 align="center">13th Cause of Action – Conversion</h3>

177.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

178.    As detailed above, Merex Aircraft intentionally and wrongfully converted and exercised dominion over Petras's Reliant-related ACE Portal credentials and historical information, as part of its continuing effort to negatively impact Petras's and Mr. Cantu's ability to pursue this litigation.

179.    As a consequence of those acts of conversion, Petras and Mr. Cantu have been damaged (and Defendants have been unjustly enriched) in an amount to be proven at trial.

180.    In acting as detailed herein, Defendants were guilty of oppression, fraud, and/or malice, entitling Petras and Mr. Cantu to exemplary and/or punitive damages pursuant to Cal. Civ. Code § 3294.

<h3 align="center">14th Cause of Action – Breach of Contract</h3>

181.    Plaintiffs re-allege and incorporate herein all preceding paragraphs.

182.    The parties agreed to mediate this dispute with Cathy Yanni, Esq. of JAMS, and met with her for several hours on December 6, 2016.

183.    At the conclusion of the parties' meetings with Ms. Yanni on December 6, she informed all of the parties (and their counsel) that she would be making a "Mediator's Proposal". As Ms. Yanni explained to the parties (and their counsel), a Mediator's Proposal is a settlement proposal made to both sides that includes all the material terms of an enforceable agreement, with each side privately responding to the mediator whether they "accept" or "reject" the proposal. No other response is permitted. If both sides "accept" the proposal, a settlement agreement has been reached and is binding and enforceable. If one or both sides "reject" the proposal, then no settlement agreement is reached. In that event, the parties are not informed of the other side's response to the

1 Mediator's proposal. This process is often as "double-blind" since each side only becomes aware of

2 the other's position in the event of a settlement agreement being reached.[6]

3          184.    The purpose of a Mediator's Proposal is to allow a party to "accept" the

4 proposal without the risk of exposing their negotiation position to the other party. In particular, a

5 party that "accepts" a Mediator's Proposal knows that one of two things will happen – either (1) a

6 settlement agreement is made and the litigation is over, or (2) the other side does not learn that the

7 party was willing to settle on the proposed terms, such that it can begin its negotiation again now

8 knowing that party would settle for less. That is precisely the reason that two "accept" responses

9 create an enforceable agreement, as otherwise a party could pretend to "accept" and then back out.

10 It is also why there is no such thing as "accept, with conditions", since again a party could pretend to

11 "accept" and then back out by creating a conflict over "conditions".

12          185.    Plaintiffs accepted the Mediator's Proposal prior to the December 12 4:00

13 p.m. deadline. Later on December 12, Ms. Yanni's assistant emailed counsel for all the parties to

14 report as follows: "All, Cathy is traveling, but asked that I let everyone know that the mediator's

15 proposal has been accepted. Thanks, Darcy." The two acceptances of the Mediator's Proposal

16 created a binding and enforceable settlement agreement (the "Parties' Settlement Agreement").

17          186.    As is typical in situations in which a Mediator's Proposal is accepted and a

18 binding and enforceable settlement is reached, the parties on December 13 agreed to consider

19 replacing the Parties' Settlement Agreement resulting from the Mediator's Proposal (a bare

20 recitation of the handful of material terms) with a more traditional long-form agreement. On

21 December 19, lead counsel for Defendants announced for the first time that Defendants would not

22 comply with the Parties' Settlement Agreement, and repudiated that agreement.

23          187.    Lead counsel for Defendants further announced a willingness to negotiate a

24 different settlement agreement. The parties have been unsuccessful in negotiating a different

25 settlement agreement.

26

27 ─────────────

28     [6]   Technically, this description is not entirely accurate, as "double-blind" typically means the researcher (here, the mediator) is not aware of the particular responses either, but the description is nevertheless commonly used in this context.

1        188.    Plaintiffs have at all times stated and indicated their willingness and ability to

2  comply with their obligations under the Parties' Settlement Agreement.

3        189.    Plaintiffs have suffered damages caused by Defendants' repudiation and

4  breach of the Parties' Settlement Agreement in the amount that Defendants agreed to pay Plaintiffs

5  in that agreement, along with additional attorneys' fees and expenses caused by Defendants'

6  repudiation and breach.

7                       **PRAYER**

8        Wherefore, Plaintiffs pray judgment against Defendants as follows:

9        1.    for damages (including exemplary/punitive damages) in an amount to be

10  determined at trial;

11        2.    for the recovery of unjust enrichment in an amount to be determined at trial;

12        3.    for costs and reasonable attorneys fees; and

13        4.    for such other relief as the Court may deem proper.

Dated:  December 29, 2016        Rimon P.C.

By: _____
Richard Mooney
Attorneys for Plaintiffs

## Demand for Jury Trial

Plaintiffs hereby demand a jury trial for all issues triable to a jury.

Dated:  December 29, 2016                    Rimon P.C.

By: _____
Richard Mooney
Attorneys for Plaintiffs

---

First Amended Complaint; Jury Demand
*Garville et al. v. Merex Holding Corp. et al.* (Case No. RG 16811618)